**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARVIN D. HORNE and LAURA R.
HORNE, DBA RAISIN VALLEY
FARMS, a partnership, and DBA
RAISIN VALLEY FARMS MARKETING
ASSOCIATION, AKA RAISIN VALLEY
MARKETING, an unincorporated
association; MARVIN D. HORNE;
LAURA R. HORNE; DON DURBAHN,
and the ESTATE OF RENA DURBAHN,
DBA LASSEN VINEYARDS, a
partnership,
              *Plaintiffs-Appellants*,

        v.

UNITED STATES DEPARTMENT OF
AGRICULTURE,
              *Defendant-Appellee*.

No. 10-15270

D.C. No.
1:08-cv-01549-
LJO-SMS

OPINION

Appeal from the United States District Court
for the Eastern District of California
Lawrence J. O'Neill, District Judge, Presiding

Argued and Submitted
February 14, 2014—San Francisco, California

Filed May 9, 2014

Before:  Stephen Reinhardt, Michael Daly Hawkins,
        and Ronald M. Gould, Circuit Judges.

Opinion by Judge Hawkins

---

**SUMMARY**[*]

---

**Taking**

Following a reversal and remand from the United States Supreme Court, the panel affirmed the district court's summary judgment in favor of the United States Secretary of Agriculture in an action alleging that the Secretary's regulatory program for California's raisin producers violated the Takings Clause of the Fifth Amendment.

Pursuant to the Agricultural Marketing Agreement Act of 1937, the Department of Agriculture implemented a "Marketing Order" to ensure orderly market conditions by regulating raisin supply.  The Secretary required California producers of certain raisins to divert a percentage of their annual crop to a reserve, and the Secretary could impose a penalty on producers who failed to comply with the diversion program.  Plaintiffs, California raisin producers, alleged that the Secretary worked a constitutional taking by depriving raisin producers of their personal property, the diverted raisins, without just compensation.

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

As a threshold issue, the panel held that the plaintiffs had standing to bring this constitutional challenge. Turning to the merits, the panel held that the Marketing Order and its penalties did not work a physical per se taking. The panel concluded that the Marketing Order's reserve requirements - and the provisions permitting the Secretary to penalize the plaintiffs for failing to comply with those requirements - did not constitute a taking under the Fifth Amendment.

## COUNSEL

Michael W. McConnell (argued), John C. O'Quinn and Joseph F. Cascio, Kirkland & Ellis LLP, Washington, D.C., and Brian C. Leighton, Clovis, California, for Plaintiffs-Appellants.

Stuart F. Delery, Acting Assistant Attorney General, Joshua Waldman (argued) and Michael S. Raab, Attorneys, Appellate Staff, Civil Division, United States Department of Justice, Washington, D.C.; Benjamin B. Wagner, United States Attorney, and Benjamin E. Hall, Assistant United States Attorney, Fresno, California, for Defendant-Appellee.

## OPINION

HAWKINS, Senior Circuit Judge:

To ensure stable market conditions, the Secretary of Agriculture, administering a complex regulatory program, requires California producers of certain raisins to divert a percentage of their annual crop to a reserve. The percentage of raisins diverted to the reserve varies annually according to

that year's crop output. Subject to administrative and judicial review, the Secretary can impose a penalty on producers who fail to comply with the diversion program. The program's goal is to keep raisin supply relatively constant from year to year, smoothing the raisin supply curve and thus bringing predictability to the market for producers and consumers alike. The diverted raisins are sold, oftentimes in noncompetitive markets, and raisin producers are entitled to a pro rata share of the sales proceeds less administrative costs. In some years, this "equitable distribution" is significant; in other years it is zero.

Eschewing any Commerce Clause or regulatory takings theory, Plaintiffs-Appellants Marvin and Laura Horne ("the Hornes") challenge this regulatory program and, in particular, the Secretary's ability to impose a penalty for non-compliance, as running afoul of the Takings Clause of the Fifth Amendment.[1] Specifically, the Hornes argue Defendant-Appellee the Department of Agriculture ("the Secretary"), charged with overseeing the diversion program, works a constitutional taking by depriving raisin producers of their personal property, the diverted raisins, without just compensation. The Secretary defends the constitutionality of the reserve requirement. Concluding the diversion program

---

[1] Collectively referred to as "the Hornes," the Plaintiffs-Appellants are Marvin and Laura Horne, d/b/a Raisin Valley Farms (a California general partnership), and d/b/a Raisin Valley Farms Marketing Association (a California unincorporated association), together with their business partners Don Durbahn and the Estate of Rena Durbahn, collectively d/b/a Lassen Vineyards (a California general partnership).

does not work a constitutional taking on the theory advanced by the Hornes, we affirm the judgment of the district court.[2]

## FACTUAL AND PROCEDURAL BACKGROUND

### A

Raisin prices rose rapidly between 1914 and 1920, peaking in 1921 at $235 per ton. This surge in prices spurred increased production, which in turn caused prices to plummet back down to between $40 and $60 per ton, even while production continued to expand. As a result of this growing disparity between increasing production and decreasing prices, the industry became "compelled to sell at less than parity prices and in some years at prices regarded by students of the industry as less than the cost of production." *Parker v. Brown*, 317 U.S. 341, 364 (1943); *see id.* at 363–64 & nn.9–10; *see also Zuber v. Allen*, 396 U.S. 168, 174–76 (1969) (describing market conditions). *See generally* Daniel Bensing, *The Promulgation of Implementation of Federal Marketing Orders Regulating Fruit and Vegetable Crops Under the Agricultural Marketing Agreement Act of 1937*, 5 San Joaquin Agric. L. Rev. 3 (1995) (describing the history of the AMAA and the structure of the regulatory program it authorizes).

This market upheaval pervaded the entire agriculture industry, prompting Congress to enact the Agricultural Marketing Agreement Act of 1937, as amended, 7 U.S.C.

---

[2] In doing so, we note the Court of Federal Claims has also upheld the constitutionality of this regulatory program. *See Evans v. United States*, 74 Fed. Cl. 554, 558 (2006), *aff'd*, 250 F. App'x. 321 (Fed. Cir. 2007) (unpub.).

§ 601 *et seq*. ("AMAA"), to bring consistency and predictability to the Nation's agricultural markets. Pursuant to the AMAA, the Department of Agriculture implemented the Marketing Order Regulating the Handling of Raisins Produced from Grapes Grown in California, 7 C.F.R. Part 989 ("Marketing Order"), in 1949 in direct response to the market conditions described in *Parker*.

The Marketing Order ensures "orderly" market conditions by regulating raisin supply. 7 U.S.C. § 602(1). The Secretary has delegated to the Raisin Administrative Committee ("RAC") the authority to set an annual "reserve tonnage" requirement, which is expressed as a percentage of the overall crop.[3] *See* 7 C.F.R. §§ 989.65–66. The remaining raisins are "free tonnage" and can be sold on the open market. The reserved raisins are diverted from the market to smooth the peaks of the raisin supply curve. *Id.* at § 989.67(a). To smooth the supply curve's valleys, reserved raisins are released when supply is low. By varying the reserve requirement annually, the RAC can adapt the program to address changing growing and market conditions. For example, in the 2002–03 and 2003–04 crop years at issue here, the reserve percentages were set at forty-seven percent and thirty percent of the annual crop, respectively.

The operation of the Marketing Order turns on a distinction between "producers" and "handlers." A "producer" is a "person engaged in a proprietary capacity in

---

[3] The RAC is currently comprised of forty-seven industry-nominated representatives appointed by the Secretary, of whom thirty-five represent producers, ten represent handlers, one represents the cooperative bargaining association, and one represents the public. *See* 7 C.F.R. §§ 989.26, 989.29, and 989.30.

the production of grapes which are sun-dried or dehydrated by artificial means until they become raisins . . . ." 7 C.F.R. § 989.11. By contrast, included in the definition of a "handler," *id.* at 989.15, is any person who "stems, sorts, cleans, or seeds raisins, grades stemmed raisins, or packages raisins for market as raisins," *id.* at 989.14.[4] Raisin producers convey their entire crop to a handler, receiving a pre-negotiated field price for the free tonnage. *Id.* at § 989.65. Handlers, who sell free tonnage raisins on the open market, bear the obligation of complying with the Marketing Order by diverting the required percentage of each producer's raisins to "the account of the [RAC]." *Id.* § 989.66(a). Handlers must also prepare the reserved raisins for market, and the RAC compensates them for providing this service. *Id.* at § 989.66(f).

The RAC tracks how many raisins each producer contributes to the reserve pool. When selling the raisins, the RAC has a regulatory duty to sell them in a way that "maxim[izes] producer returns." *Id.* at § 989.67(d)(1). The RAC, which receives no federal funding, finances its operations and the disposition of reserve raisins from the proceeds of the reserve raisin sales. Whatever net income remains is disbursed to producers, who retain a limited equity

---

[4] Specifically, any person who "stems, sorts, cleans, or seeds raisins, grades stemmed raisins, or packages raisins for market as raisins" is a "packer" of raisins, and all packers are handlers. 7 C.F.R. §§ 989.14 & 989.15. These definitions apply only to activities taking place within "the area," which simply refers to the State of California. *Id.* at § 989.4.

Additionally, any producer who sorts and cleans his own raisins in their unstemmed form is not a packer with respect to those raisins. 7 C.F.R. § 989.14.

interest in the RAC's net income derived from reserved raisins. *See* 7 U.S.C. § 608c(6)(E); 7 C.F.R. § 989.66(h).

**B**

Dissatisfied with what they view as an out-dated regulatory regime, the Hornes set out to restructure their raisin operation such that the Marketing Order would not operate against them. Put another way, the Hornes came up with a non-traditional packing program which, in their view, the Secretary had no authority to regulate. Instead of sending their raisins to a traditional packer, against whom the reserve requirement of the Marketing Order would clearly operate, the Hornes purchased their own handling equipment to clean, stem, sort, and package raisins. The Hornes then performed the traditional functions of a handler with respect to the raisins they produced. The Hornes believed that, by cleaning, stemming, sorting, and packaging their own raisins, they would not be "handlers" with respect to the raisins they produced. In addition, the Hornes performed the same functions for a number of other producers for a per-pound fee. Similarly, by not acquiring title to the raisins of other producers but rather charging those producers a per-pound fee, the Hornes believed they did not fall within the regulatory definition of "handler" with respect to the third-party producers' raisins. With this set-up, the Hornes believed the requirements of the Marketing Order would not apply to them, relieving them of the obligation to reserve any raisins.[5]

---

[5] The government contends the Hornes lack standing to assert a takings defense with respect to raisins they never owned, i.e., raisins produced by third parties. The government concedes the Hornes have standing to assert a takings defense with respect to raisins they produced themselves.

## C

The Secretary disagreed with the Hornes and applied the Marketing Order to their operation with respect to the raisins grown both by the Hornes and by third-party producers. At the end of protracted administrative proceedings, a U.S.D.A. Judicial Officer found the Hornes liable for numerous regulatory violations and imposed a monetary penalty of $695,226.92.[6] The Hornes then sought review of that final agency action in federal district court pursuant to 7 U.S.C. § 608c(14)(B). In district court, the Hornes alleged they were not "handlers" within the meaning of the regulation and further alleged the agency's order violated the Takings Clause and the Eighth Amendment's prohibition against excessive fines. The district court granted summary judgment in favor

---

We decline to decide what rights under California law a non-title holder has to challenge the "taking" of property in his possession. *See Vandevere v. Lloyd*, 644 F.3d 957, 963 (9th Cir. 2011) (holding that for the takings claim "whether a property right exists . . . is a question of state law") (emphasis omitted). Here, it is enough to note the Hornes clearly have standing to assert a taking defense with respect to the raisins they produced themselves, entitling them to a decision on the merits for at least that property. Because we rule against the Hornes on the merits, we need not further address the standing issue.

[6] The Judicial Officer ordered the Hornes to pay (1) $8,783.39 in overdue assessments for the 2002–03 and 2003–04 crop years, (2) $483,843.53 as the dollar equivalent for the raisins not held in reserve, and (3) $202,600 as a civil penalty for failure to comply with the Marketing Order. The overdue assessments in their entirety and $25,000 of the civil penalty were imposed for violations of the Marketing Order unrelated to the reserve requirement. *See, e.g.*, 7 C.F.R. § 989.73 (requiring handlers to file certain reports); *id.* at § 989.77 (requiring handlers to allow the Agricultural Marketing Service access to records). The balance of the penalty and assessments pertain directly to the Hornes' failure to reserve raisins.

of the Secretary on all counts. *See Horne v. U.S. Dep't of Agric.*, No. CV-F-08-1549 LJO SMS, 2009 WL 4895362 (E.D. Cal. filed Dec. 11, 2009).

The Hornes appealed to this court. We affirmed the district court with respect to the Hornes' statutory claims, holding that even if the AMAA's definitions of "handler" and "producer" are ambiguous, the Secretary's application of the Marketing Order to the Hornes was neither arbitrary nor capricious, and it was supported by substantial evidence. *Horne v. U.S. Dep't of Agric.*, 673 F.3d 1071, 1078 (9th Cir. 2011) ("*Horne I*"). We also affirmed the district court's grant of summary judgment in favor of the Secretary on the Eighth Amendment claim. *Id.* at 1080–82. And we held we lacked jurisdiction over the Fifth Amendment claim. Specifically, we held the Hornes brought their takings claim as producers rather than handlers. Because the AMAA did not in our view displace the Tucker Act with respect to a producer's claim, we held that jurisdiction over the takings claim fell with the Court of Federal Claims rather than the district court. *Id.* at 1078–80.

The Hornes sought and the Supreme Court granted certiorari with respect to the jurisdictional issue.[7] Reversing our judgment on that issue alone, the Supreme Court held (1)

---

[7] Because the Hornes' certiorari petition only challenged our disposition of the Hornes' Fifth Amendment claim, *Horne I* is the final judgment of the Hornes' Eighth Amendment and statutory claims. Accordingly, because the statutory claims are no longer at bar, the Hornes concede they no longer challenge the Judicial Officer's imposition of $8,783.39 in overdue assessments or the related $25,000 in civil penalties. The Hornes' challenge is confined to the remaining dollar value equivalent and its attendant civil penalty (hereinafter, "the penalty"), because these are directly traceable to the Hornes' failure to reserve raisins. *See supra* n.5.

the Hornes brought their takings claim as handlers, and (2) the Hornes, as handlers, may assert a constitutional defense to the underlying agency action in district court. *Horne v. Dep't of Agric.*, 133 S. Ct. 2053, 2061, 2062 (2013). (The Supreme Court reserved the question of whether the Hornes could have sought relief in the Court of Federal Claims, instead holding only that handlers could obtain judicial review in district court. *Id.* at 1062 n.7.) The Supreme Court remanded for a determination of the merits of the Hornes' takings claim, which, having received supplementary briefing and additional oral argument, we now decide.

## STANDARD OF REVIEW

We review de novo a district court's grant of summary judgment in a case involving a constitutional challenge to a federal regulation. *Ariz. Life Coal., Inc. v. Stanton*, 515 F.3d 956, 962 (9th Cir. 2008); *Doe v. Rumsfeld*, 435 F.3d 980, 984 (9th Cir. 2006).

## STANDING

The Secretary contends the Hornes lack standing to challenge the portion of the penalty attributable to the sale of any raisins produced by third-party firms, then handled by the Hornes (the "third-party raisins"). The Secretary argues the Hornes never owned these raisins and so cannot challenge their seizure.[8] We find this argument unpersuasive.

---

[8] The Secretary concedes the Hornes have standing to challenge the remainder of the penalty.

As the Supreme Court made clear, the injury suffered by the Hornes is not the obligation to reserve raisins for the RAC (which, of course, the Hornes did not do), but rather to pay the penalty imposed for the Hornes' failure to comply with the Marketing Order. *Horne*, 133 S. Ct. at 2061 n.4. Thus, the government's contention that the Hornes would not have standing to challenge a government seizure of the third-party raisins (a seizure which, of course, never happened) is irrelevant to the standing inquiry here.[9]

Instead, we analyze whether the Hornes have standing to challenge the penalty. A monetary penalty is an actual, concrete and particularized injury-in-fact. *Sacks v. Office of Foreign Assets Control*, 466 F.3d 764, 771 (9th Cir. 2006) (citing *Cent. Ariz. Water Conserv. Dist. v. EPA*, 990 F.2d 1531, 1537 (9th Cir. 2006)); *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The need to pay a penalty is obviously traceable to its imposition, and a favorable merits determination in this litigation would redress the Hornes' alleged injury, thereby satisfying the *Lujan* requirements. *See Lujan*, 504 U.S. at 560–61. We thus hold

---

[9] Additionally, we doubt the government's contention that the Hornes would lack standing to challenge a seizure of property they held in bailment. In an analogous situation, we have held that individuals lacking an ownership interest in a given piece of property have standing to challenge the seizure of that property. *See United States v. $191,910 in U.S. Currency*, 16 F.3d 1051, 1057 (9th Cir. 1994) ("In order to contest a forfeiture, a claimant need only have some type of property interest in the forfeited items. This interest need not be an ownership interest; it can be any type of interest, including a possessory interest."), *superseded on other grounds by statute as stated in United States v. $80,180.00*, 303 F.3d 1182, 1184 (9th Cir. 2002). In any event, because we hold the Hornes have established standing as the subjects of the penalty, we need not confront this question.

the Hornes have standing to bring this constitutional challenge.

## CONSTITUTIONAL CLAIM

The Takings Clause does not prohibit the government from taking property for public use; rather, it requires the government to pay "just compensation" for any property it takes. U.S. Const. amend. V. Thus, a takings challenge follows a two-step inquiry. First, we must determine whether a "taking" has occurred; that is, whether the complained-of government action constitutes a "taking," thus triggering the requirements of the Fifth Amendment. If so, we move to the second step and ask if the government provided just compensation to the former property owner. *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 231–32, 235–36 (2003); *First English Evangelical Lutheran Church of Glendale v. Cnty. of L.A.*, 482 U.S. 304, 314 (1987).

However, before turning to the first step of this formula, we must address a threshold issue and identify precisely which property was allegedly taken from the Hornes.

## A

The Hornes declined to comply with the reserve requirement of the Marketing Order; at no time did the Hornes, either as producers or as handlers, ever physically convey raisins to the RAC. Instead, the Secretary imposed the penalty on the Hornes for their failure to comply with the Marketing Order. In general, the imposition and collection of penalties and fines does not run afoul of the Takings Clause. *See Koontz v. St. Johns River Water Management District*, 133 S. Ct. 2586, 2601 (2013) (listing cases). Here, however,

the Hornes link the Secretary's imposition of a penalty to a specific governmental action they allege to be a taking. In effect, the Hornes argue the constitutionality of the penalty rises or falls with the constitutionality of the Marketing Order's reserve requirement.

We agree that the penalty cannot be analyzed without reference to the reserve requirement, and we find *Koontz* instructive on this point. In *Koontz*, a permitting agency refused to grant a developer a building permit until the developer funded offsite environmental impact mitigation works. 133 S. Ct. at 2593. The developer sued, arguing the permitting agency's conditions for obtaining a permit violated the "nexus and rough proportionality" rule of *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987), and *Dolan v. City of Tigard*, 512 U.S. 374 (1994).[10] The Supreme Court of Florida declined to apply *Nollan* and *Dolan*, because in those cases the permitting agencies granted the relevant permit subject to a condition subsequent. The Florida court did not believe *Nollan* and *Dolan* would apply to situations in which the permitting agency refused to issue a permit until the permittee met a condition precedent. The Supreme Court reversed, holding the distinction between conditions precedent and subsequent constitutionally irrelevant in this context. *See id*. at 2596.

Relevant to this case, *Koontz* confronts the issue of how to analyze a takings claim when a "monetary exaction," rather than a specific piece of property, is the subject of that claim. *Koontz* distinguished *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1988), by noting that in *Koontz*, "unlike *Eastern Enterprises*, the monetary obligation burdened petitioner's

---

[10] We discuss *Nollan* and *Dolan* in more detail in Section D.

ownership of a specific parcel of land." *Koontz*, 133 S. Ct. at 2599; *accord id.* at 2600 ("The fulcrum this case turns on is the direct link between the government's demand and a specific parcel of real property."). This direct linkage between the monetary exaction and the piece of land guided the Court to invoke the substantive takings jurisprudence relevant to the *land* for the purpose of determining whether the related *monetary exaction* constituted a taking. *Id.*

Here, the Secretary specifically linked a monetary exaction (the penalty imposed for failure to comply with the Marketing Order) to specific property (the reserved raisins). The Hornes faced a choice: relinquish the raisins to the RAC or face the imposition of a penalty. There is no question the monetary exaction is linked to specific property because the Judicial Officer's order requires the Hornes to repay the market value of the unreserved raisins (plus an additional penalty for non-compliance). Because the Marketing Order is structured in this way, we follow *Koontz* to analyze the constitutionality of the penalty imposed on the Hornes against the backdrop of the reserve requirement. If the Secretary works a constitutional taking by accepting (through the RAC) reserved raisins, then, under the unconstitutional conditions doctrine, the Secretary cannot lawfully impose a penalty for non-compliance. But if the receipt of reserved raisins does not violate the Constitution, neither does imposition of the penalty. *See id.* at 2596 (discussing the unconstitutional conditions doctrine).[11]

---

[11] Contrary to the Hornes' suggestion, however, we read *Koontz* only to say this much. The Hornes argue *Koontz* somehow substantively altered the doctrinal landscape against which we evaluate takings claims. We disagree. *Koontz* simply clarifies the range of takings cases in which *Nollan* and *Dolan* provide the rule of decision. *See* 133 S. Ct. at 2598

**B**

We return to the task of determining whether the imposition of the penalty for failure to comply with the reserve requirement constitutes a taking. A "paradigmatic taking" occurs when the government appropriates or occupies private property. *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537 (2005). *Lingle* gives as an example of this sort of taking the government's wartime seizure of a coal mine. *Id.*; *see United States v. Pewee Coal Co.*, 341 U.S. 114, 115–16 (1951). Because the government neither seized any raisins from the Hornes' land nor removed any money from the Hornes' bank account, the Hornes cannot—and do not—argue they suffered this sort of "paradigmatic taking."

Instead, we must enter the doctrinal thicket of the Supreme Court's regulatory takings jurisprudence. Since *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1945), the Court has recognized that "government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster—and that such 'regulatory takings' may be compensable . . . ." *Lingle*, 544 U.S. at 538. In general, regulatory takings are analyzed under the ad hoc framework announced in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978). The Hornes, however, have intentionally declined to pursue a *Penn Central* claim. Instead, they argue the

---

(declining to address merits of petitioner's claim under *Nollan* and *Dolan*); *id.* at 2602–03 (declining to alter or overrule the holdings of *Nollan* and *Dolan*).

Marketing Order, though a regulation, works a categorical taking.[12]

Since *Mahon*, the Supreme Court has identified three "relatively narrow categories" of regulations which work a categorical, or per se, taking. Each category has a paradigmatic or representative case. *Lingle*, 544 U.S. at 538.[13] The representative case of the first category, *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 427–38 (1982), holds that permanent physical invasions of real property work a per se taking. The second, represented by *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015 (1992), teaches that regulations depriving owners of all economically beneficial use of their real property also work a per se taking. The third line of cases, represented by *Nollan* and *Dolan*, articulate a more nuanced rule. Together, *Nollan* and *Dolan* hold that a condition on the grant of a land use permit requiring the forfeiture of a property right constitutes a taking *unless* the condition (1) bears a sufficient nexus with and (2) is roughly proportional to the specific interest the government seeks to protect through the permitting process.

---

[12] Similarly, the Hornes concede the AMAA and Marketing Order fall within Congress's Commerce Clause authority. However, that a governmental action is authorized by the Commerce Clause does not immunize it from the requirements of the Takings Clause. *Lingle*, 544 U.S. at 543; *Kaiser Aetna v. United States*, 444 U.S. 164, 172 (1979).

[13] We read *Lingle* to elevate the land use exaction cases to a third category on par with permanent physical invasions and complete economic deprivation regulations. 544 U.S. at 538 ("Outside these two categories (*and* the special context of land-use exactions discussed below), regulatory takings challenges are governed by *Penn Central Transp. Co. v. New York City*.") (citation omitted and emphasis added).

If those two conditions are met, then the imposition of the conditional exaction is not a taking.

We must determine which analytical framework provides the proper point of departure for our inquiry into whether a taking has occurred here. The Hornes see a direct analogy between *Loretto*'s occupation of land for the purpose of installing an antenna and the Marketing Order's reserve requirement. The Secretary argues *Nollan* and *Dolan* provide better guidance to evaluate the constitutionality of what the Secretary characterizes as a use restriction on raisins. We must first identify which of the categorical takings case lines, if any, the Marketing Order implicates. Second, we must apply that case line's substantive law to determine whether a taking has occurred.

## C

*Loretto* applies only to a total, permanent physical invasion of real property. Two independent reasons assure us that the Marketing Order does not fall within the "very narrow" scope of the *Loretto* rule, 458 U.S. at 441: First, the Marketing Order operates on personal, rather than real property, and second, the Marketing Order is carefully crafted to ensure the Hornes are not completely divested of their property rights, even with respect to the reserved raisins.

### 1

The Marketing Order operates against personal, rather than real, property. Because the Takings Clause undoubtedly protects personal property, *see Phillips v. Wash. Legal Found.*, 524 U.S. 156, 172 (1998) (interest earned on lawyers' trust account is a protected private property); *Brown*,

538 U.S. at 235 (same); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1001–04 (1984) (same for trade secrets), this distinction does not mean the Takings Clause is inapplicable. But, as the Supreme Court stated in *Lucas*, the Takings Clause affords less protection to personal than to real property:

> [O]ur "takings" jurisprudence . . . has traditionally been guided by the understandings of our citizens regarding the content of, and the State's power over, the "bundle of rights" that they acquire when they obtain title to property. It seems to us that the property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers; as long recognized, some values are enjoyed under an implied limitation and must yield to the police power. And in the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, he ought to be aware of the possibility that new regulation might even render his property economically worthless (at least if the property's only economically productive use is sale or manufacture for sale). In the case of land, however, we think the notion pressed by the Council that title is somehow held subject to the "implied limitation" that the State may subsequently eliminate all economically valuable use is inconsistent with the historical compact

recorded in the Takings Clause that has become part of our constitutional culture.

*Lucas*, 505 U.S. at 1027–28.

*Lucas* uses comparative language to make clear the Takings Clause affords more protection to real than to personal property. While the precise contours of these differing levels of protection are not entirely sharp, *Lucas* suggests the government's authority to regulate such property without working a taking is at its apex where, as here, the relevant governmental program operates against personal property and is motivated by economic, or "commercial," concerns. Indeed, it is clear the holding of *Lucas* is limited to cases involving land. The sentence which rejects the State's contention that "the State may subsequently eliminate all economically valuable use" of the Lucas's property begins with the phrase "[i]n the case of land" and is expressly contrasted against commercial personal property, over which the government exerts a "traditionally high degree of control." *Id.* at 1028.

The real/personal property distinction also undergirds *Loretto*. Justifying its bright-line rule, *Loretto* states "whether a permanent physical occupation has occurred presents relatively few problems of proof. The placement of a fixed structure on *land or real property* is an obvious fact that will rarely be subject to dispute." 458 U.S. at 437 (emphasis added). This example underscores the narrow reach of *Loretto*. In reaching its decision, the Court discussed the evolution of its takings jurisprudence, citing virtually only cases pertaining to real property. *See id.* at 427–37. And because the case unquestionably (and solely) concerned real property, the *Loretto* Court did not have occasion to consider

the occupation of personal property.  Given the Court's later discussion of personal property in *Lucas*, we see no reason to extend *Loretto* to govern controversies involving personal property.  *See also Wash. Legal Found. v. Legal Found. of Wash.*, 271 F.3d 835, 854 (9th Cir. 2001) (en banc), *aff'd sub nom.*, *Brown v. Legal Found. of Wash.*, 538 U.S. 216 (2003) ("The per se analysis has not typically been employed outside the context of real property.  It is a particularly inapt analysis when the property in question is money.").

**2**

Equally importantly, the Hornes did not lose all economically valuable use of their personal property.  Unlike *Loretto*, which applies only when *each* "'strand' from the 'bundle' of property rights" is "chop[ped] through . . . taking a slice of every strand," 458 U.S. at 435, the Hornes' rights with respect to the reserved raisins are not extinguished because the Hornes retain the right to the proceeds from their sale.  *See* 7 U.S.C. § 608c(6)(E); 7 C.F.R. § 989.66(h).  The Hornes essentially call this right meaningless because the equitable distribution may be zero.[14]   But, the equitable distribution is not zero in every year, and even in years with a zero distribution, there are gross proceeds from the sale of the reserved raisins; it just so happens that in those years, those gross proceeds are not greater than the operating expenses of the RAC.

---

[14] The parties dispute whether there was a distribution for the crop years in question and, if so, the value of that distribution.  We do not consider this dispute material to the question of whether a taking occurred because the distribution reflects net revenue.  For the reasons we give, we focus on the gross revenue generated by the reserve raisin pool.

Here, we pause to focus on the RAC's structure and purpose, as well as the benefits it secures for producers such as the Hornes. The RAC is governed by industry representatives including producers and handlers.[15]    Its purpose is to stabilize market conditions for raisin producers. Thus, the Hornes' equitable stake in the reserved raisins, even in years in which they are not entitled to a cash distribution from the RAC, funds the administration of an industry committee tasked with (1) representing raisin producers, such as the Hornes, and (2) implementing the reserve requirement, the effect of which is to stabilize the field price of raisins. In light of this scheme, the Hornes cannot claim they lose all rights associated with the reserve raisins. Indeed, the structure of the diversion program ensures the reserved raisins continue to work to the Hornes' benefit after they are diverted to the RAC, even in years in which producers receive no equitable distribution of the RAC's net profits.[16]

For these reasons, the Hornes' reliance on *Loretto* is unavailing. *Loretto* specifically preserves the state's "substantial authority" and "broad power to impose appropriate restrictions upon an owner's use of his property." 458 U.S. at 441. Here, the reserved raisins are not permanently occupied; rather, their disposition, while tightly controlled, inures to the Hornes' benefit. Coupled with

---

[15] In fact, Mr. Horne has been an alternate member, though never a voting member, of the RAC.

[16] We must clarify that we do not hold the RAC's market intervention constitutes "just compensation" for a taking. Because we hold no taking occurs, we do not conduct a just compensation inquiry. We discuss the RAC's purpose and organization solely to show that the Hornes' rights to the reserved raisins, even if diminished by the Marketing Order, are not extinguished by it.

*Lucas*'s distinction between real and personal property, this assures us the diversion program does not work a per se taking.[17]

**D**

Instead of looking to *Loretto* for the rule of decision here, the Secretary urges us to apply the "nexus and rough proportionality" rule of *Nollan* and *Dolan* to this case, asking us in essence to hold that the reserve requirement constitutes a use restriction on the Hornes' personal property and then analogize that use restriction to the land use permitting context. We believe this approach is the most faithful way to apply the Supreme Court's precedents to the Hornes' claim.[18]

In *Nollan*, the California Coastal Commission conditioned the grant of a permit to build a beachfront home on the landowner's surrender of an easement along the coastal side of the property in order to link two public beaches by a publically accessible path. 483 U.S. at 828. However, the Commission's proffered reason for imposing this condition was to mitigate the diminished "visual access" to the ocean

---

[17] Nor would the Hornes fare any better under a *Lucas* theory. *Lucas* plainly applies only when the owner is deprived of *all* economic benefit of the property. 505 U.S. at 1019 & n. 8. If the property retains any residual value after the regulation's application, *Penn Central* applies. *Id.* The equitable stake, even in years where there is no monetary distribution, is clearly not valueless, and thus *Lucas* does not apply.

[18] We do not mean to suggest that all use restrictions concerning personal property must comport with *Nollan* and *Dolan*. Rather, we hold *Nollan* and *Dolan* provide an appropriate framework to decide *this* case given the significant but not total loss of the Hornes' possessory and dispositional control over their reserved raisins.

from the *non*-coastal edge of the property caused by the Nollan's proposed improvement. *Id.* at 828–29. The Supreme Court held there was no "nexus" between the exaction-by-condition and the Commission's asserted state interest, then held that, absent such a nexus, the imposition of the condition was a taking. *Id.* at 837.

*Dolan* provides us the analytical framework to apply in cases where a legitimate nexus exists between the asserted state interest and the proposed exaction. In *Dolan*, a landowner sought permits to enlarge and improve her commercial property. As in *Nollan*, the permitting agency approved the permit subject to certain conditions. First, the agency required the dedication of certain creek-side land for the purpose of mitigating the increased water run-off that could potentially occur as a result of the landowner's plan to pave a parking lot. Second, the agency required the dedication of a 15-foot strip of land to be used for a pedestrian and bicycle pathway, the purpose of which was to mitigate the increased traffic flow spawned by the proposed commercial development. 512 U.S. at 380. *Dolan* held there was an appropriate nexus between the state's legitimate interests and the proposed exactions. *Id.* at 387–88.

But *Dolan* also held the proposed means and the ends in question were not "roughly proportional[]" to each other and thus the permit as issued constituted a taking. *Id.* at 391; *see id.* at 394–96. While not reducible to mathematical certainty, the *Dolan* "rough proportionality" requirement does require a permitting agency to "make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development." *Id.* at 391. Thus, the distillate of the *Nollan*/*Dolan* rule appears to be this: If the government seeks

to obtain, through the issuance of a conditional land use permit, a property interest the outright seizure of which would constitute a taking, the government's imposition of the condition *also* constitutes a taking unless it: (1) bears a sufficient nexus with and (2) is roughly proportional to the specific interest the government seeks to protect through the permitting process.

We apply the *Nollan*/*Dolan* rule here because we believe it serves to govern this use restriction as well as it does the land use permitting process.   At bottom, the reserve requirement is a use restriction applying to the Hornes insofar as they voluntarily choose to send their raisins into the stream of interstate commerce.   The Secretary did not authorize a forced seizure of the Hornes' crops, but rather imposed a condition on the Hornes' *use* of their crops by regulating their sale.  As we explained in a similar context over seventy years ago, the Marketing Order "contains no absolute requirement of the delivery of [reserve-tonnage raisins] to the [RAC]" but rather only "a conditional one."  *Wallace v. Hudson-Duncan & Co.*, 98 F.2d 985, 989 (9th Cir. 1938) (rejecting a takings challenge to a reserve requirement under the walnut marketing order); *see also Yee v. City of Escondido*, 503 U.S. 519, 527–28 (1992) (holding municipal regulation of a mobile home park owners' ability to rent did not work a taking where park owners voluntarily rented their land and thus acquiesced in the regulation); *cf. Ruckelshaus*, 467 U.S. 986, 1070  (1994) ("a voluntary submission of data by an applicant in exchange for the economic advantages of a registration can hardly be called a taking").

Moreover, there are important parallels between *Nollan* and *Dolan* on one hand and the raisin diversion program on the other.  All involve a conditional exaction, whether it be

the granting of an easement, as in *Nollan*; a transfer of title, as in *Dolan*; or the loss of possessory and dispositional control, as here. All conditionally grant a government benefit in exchange for an exaction. And, critically, all three cases involve choice. Just as the Nollans could have continued to lease their property with the existing bungalow and Ms. Dolan could have left her store and unpaved parking lot as they were, the Hornes, too, can avoid the reserve requirement of the Marketing Order by, as the Secretary notes, planting different crops, including other types of raisins, not subject to this Marketing Order or selling their grapes without drying them into raisins. Given these similarities, we are satisfied the rule of *Nollan* and *Dolan* governs this case.

## 1.  The Nexus Requirement

We now turn to the nexus requirement and ask if the reserve program "further[s] the end advanced as [its] justification." *Nollan*, 483 U.S. at 837. Unquestionably, the AMAA aims to "establish and maintain . . . orderly marketing conditions for agricultural commodities," 7 U.S.C. § 602(1), as well as to keep consumer prices stable, *id.* at § 602(2). By reserving a dynamic percentage of raisins annually such that the domestic raisin supply remains relatively constant, the Marketing Order program furthers the end advanced: obtaining orderly market conditions. The government represents (and the Hornes do not dispute) that by smoothing the peaks and valleys of the supply curve, the program has eliminated the severe price fluctuations common in the raisin industry prior to the implementation of the Marketing Order, making market conditions predictable for industry and consumers alike. On this basis, the Marketing Order satisfies the *Nollan* nexus requirement.

## 2.  The Rough Proportionality Requirement

*Dolan* does not require a "precise mathematical calculation," instead obliging the permitting agency only to make an "individualized determination" that the condition imposed is "related both in nature and extent to the impact" of the permittee's activity.  *Dolan*, 512 U.S. at 391.  The Marketing Order meets this requirement.  The percentage of raisins to be reserved is revised annually to conform to current market conditions.  While *Dolan* does not require a "mathematical calculation," neither does it prohibit the RAC from imposing a condition stated mathematically, i.e., as a percentage.  Indeed, here the RAC's imposition of the reserve requirement is not just in "rough" proportion to the goal of the program, but in more or less *actual* proportion to the end of stabilizing the domestic raisin market.[19]  By annually modifying the "extent," *id.*, of the reserve requirement to keep pace with changing market conditions, the RAC ensures its program does not overly burden the producer's ability to compete while reducing to the producer's benefit the potential instability of this particular market.

Nor do we believe *Dolan*'s command that the condition imposed be "individualized" presents a problem here.  As *Dolan* made clear, it was an adjudicative, not a legislative, decision being reviewed.  512 U.S. at 835.  Individualized review makes sense in the land use context because the development of each parcel is considered on a case-by-case

---

[19] The Hornes do not challenge the adequacy or fairness of the RAC's decision to set the 2002–03 and 2003–04 reserve tonnage requirements at forty-seven percent and thirty percent, respectively. In other words, the Hornes' challenge is to the program itself, not the details of its implementation in the crop years at issue.

basis. But here, the use restriction is imposed evenly across the industry; all producers must contribute an equal percentage of their overall crop to the reserve pool. At bottom, *Dolan*'s individualized review ensures the government's implementation of the regulations is tailored to the interest the government seeks to protect. The Marketing Order accomplishes this goal by varying the reserve requirement annually in accordance with market and industry conditions. Given that raisins are fungible (as opposed to land, which is unique), we think this is enough to ensure the means of the Marketing Order's diversion program is at least roughly proportional to its goals.[20]

## CONCLUSION

While the Hornes' impatience with a regulatory program they view to be out-dated and perhaps disadvantageous to smaller agricultural firms is understandable, the courts are not well-positioned to effect the change the Hornes seek, which is, at base, a restructuring of the way government regulates raisin production. The Constitution endows Congress, not the courts, with the authority to regulate the national economy. *See United States v. Rock Royal Co-op, Inc.*, 307 U.S. 533, 572 (1939). Accordingly, it is to Congress and the Department of Agriculture to which the Hornes must address their complaints. The courts are not institutionally equipped

---

[20] We reiterate that we analyze the Hornes' challenge to the monetary penalty through the lens of the Marketing Order's reserve requirement because the monetary penalty is pegged directly to the extent of the Hornes' non-compliance with the Order, as measured by the ton and market value of the raisins. Accordingly, we hold the Secretary's imposition of the penalty satisfies any requirement *Koontz* may impose that we independently analyze the monetary exaction under *Nollan* and *Dolan*.

to modify wholesale complex regulatory regimes such as this one.

Instead, our role is to answer the narrower question of whether the Marketing Order and its penalties work a physical per se taking. We hold they do not. There is a sufficient nexus between the means and ends of the Marketing Order. The structure of the reserve requirement is at least roughly proportional (and likely actually proportional) to Congress's stated goal of ensuring an orderly domestic raisin market. We reach these conclusions informed by the Supreme Court's acknowledgment that governmental regulation of personal property is more foreseeable, and thus less intrusive, than is the taking of real property. This, coupled with our observation that the Secretary has endeavored to preserve as much of the Hornes' ownership of the raisins as possible, leads us to conclude the Marketing Order's reserve requirements—and the provisions permitting the Secretary to penalize the Hornes for failing to comply with those requirements—do not constitute a taking under the Fifth Amendment.

**AFFIRMED.**