(Slip Opinion)      OCTOBER TERM, 2014      1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## HORNE ET AL. *v.* DEPARTMENT OF AGRICULTURE

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 14–275.   Argued April 22, 2015—Decided June 22, 2015

The Agricultural Marketing Agreement Act of 1937 authorizes the Secretary of Agriculture to promulgate "marketing orders" to help maintain stable markets for particular agricultural products. The marketing order for raisins established a Raisin Administrative Committee that imposes a reserve requirement—a requirement that growers set aside a certain percentage of their crop for the account of the Government, free of charge. The Government makes use of those raisins by selling them in noncompetitive markets, donating them, or disposing of them by any means consistent with the purposes of the program. If any profits are left over after subtracting the Government's expenses from administering the program, the net proceeds are distributed back to the raisin growers. In 2002–2003, raisin growers were required to set aside 47 percent of their raisin crop under the reserve requirement. In 2003–2004, 30 percent. Marvin Horne, Laura Horne, and their family are raisin growers who refused to set aside any raisins for the Government on the ground that the reserve requirement was an unconstitutional taking of their property for public use without just compensation. The Government fined the Hornes the fair market value of the raisins as well as additional civil penalties for their failure to obey the raisin marketing order.

The Hornes sought relief in federal court, arguing that the reserve requirement was an unconstitutional taking of their property under the Fifth Amendment. On remand from this Court over the issue of jurisdiction, *Horne* v. *Department of Agriculture*, 569 U. S. ___, the Ninth Circuit held that the reserve requirement was not a Fifth Amendment taking. The court determined that the requirement was not a *per se* taking because personal property is afforded less protection under the Takings Clause than real property and because the

Hornes, who retained an interest in any net proceeds, were not completely divested of their property. The Ninth Circuit held that, as in cases allowing the government to set conditions on land use and development, the Government imposed a condition (the reserve requirement) in exchange for a Government benefit (an orderly raisin market). It held that the Hornes could avoid relinquishing large percentages of their crop by "planting different crops." 730 F. 3d 1128, 1143.

*Held*: The Fifth Amendment requires that the Government pay just compensation when it takes personal property, just as when it takes real property. Any net proceeds the raisin growers receive from the sale of the reserve raisins goes to the amount of compensation they have received for that taking—it does not mean the raisins have not been appropriated for Government use. Nor can the Government make raisin growers relinquish their property without just compensation as a condition of selling their raisins in interstate commerce. Pp. 4–18.

   (a) The Fifth Amendment applies to personal property as well as real property. The Government has a categorical duty to pay just compensation when it takes your car, just as when it takes your home. Pp. 4–9.

      (1) This principle, dating back as far as Magna Carta, was codified in the Takings Clause in part because of property appropriations by both sides during the Revolutionary War. This Court has noted that an owner of personal property may expect that new regulation of the use of property could "render his property economically worthless." *Lucas* v. *South Carolina Coastal Council*, 505 U. S. 1003, 1027–1028. But there is still a "longstanding distinction" between regulations concerning the use of property and government acquisition of property. *Tahoe-Sierra Preservation Council, Inc.* v. *Tahoe Regional Planning Agency*, 535 U. S. 302, 323. When it comes to physical appropriations, people do not expect their property, real or personal, to be actually occupied or taken away. Pp. 4–8.

      (2) The reserve requirement imposed by the Raisin Committee is a clear physical taking. Actual raisins are transferred from the growers to the Government. Title to the raisins passes to the Raisin Committee. The Committee disposes of those raisins as it wishes, to promote the purposes of the raisin marketing order. The Government's formal demand that the Hornes turn over a percentage of their raisin crop without charge, for the Government's control and use, is "of such a unique character that it is a taking without regard to other factors that a court might ordinarily examine." *Loretto* v. *Teleprompter Manhattan CATV Corp.*, 458 U. S. 419, 432. Pp. 8–9.

   (b) The fact that the growers are entitled to the net proceeds of the

raisin sales does not mean that there has been no taking at all. When there has been a physical appropriation, "we do not ask . . . whether it deprives the owner of all economically valuable use" of the item taken. *Tahoe-Sierra Preservation Council*, 535 U. S., at 323. The fact that the growers retain a contingent interest of indeterminate value does not mean there has been no taking, particularly when that interest depends on the discretion of the taker, and may be worthless, as it was for one of the two years at issue here. *Andrus* v. *Allard*, 444 U. S. 51, distinguished. Once there is a taking, as in the case of a physical appropriation, any payment from the Government in connection with that action goes, at most, to the question of just compensation. Pp. 9–12.

(c) The taking in this case also cannot be characterized as part of a voluntary exchange for a valuable government benefit. In one of the years at issue, the Government insisted that the Hornes part with 47 percent of their crop for the privilege of selling the rest. But the ability to sell produce in interstate commerce, although certainly subject to reasonable government regulation, is not a "benefit" that the Government may withhold unless growers waive constitutional protections. *Ruckelshaus* v. *Monsanto Co.*, 467 U. S. 986, distinguished. *Leonard & Leonard* v. *Earle*, 279 U. S. 392, distinguished. Pp. 12–14.

(d) The Hornes are not required to first pay the fine and then seek compensation under the Tucker Act. See *Horne*, 569 U. S., at ___. Because they have the full economic interest in the raisins the Government alleges should have been set aside for its account—*i.e.,* they own the raisins they grew as well as the raisins they handled, having paid the growers for all of their raisins, not just their free-tonnage raisins—they may raise a takings-based defense to the fine levied against them. There is no need for the Ninth Circuit to calculate the just compensation due on remand. The clear and administrable rule is that "just compensation normally is to be measured by 'the market value of the property at the time of the taking.'" *United States* v. *50 Acres of Land*, 469 U. S. 24, 29. Here, the Government already calculated that amount when it fined the Hornes the fair market value of the raisins. Pp. 14–18.

750 F. 3d 1128, reversed.

ROBERTS, C. J., delivered the opinion of the Court, in which SCALIA, KENNEDY, THOMAS, and ALITO, JJ., joined, and in which GINSBURG, BREYER, and KAGAN, JJ., joined as to Parts I and II. THOMAS, J., filed a concurring opinion. BREYER, J., filed an opinion concurring in part and dissenting in part, in which GINSBURG and KAGAN, JJ., joined. SOTOMAYOR, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 14–275

MARVIN D. HORNE, ET AL., PETITIONERS *v.*
DEPARTMENT OF AGRICULTURE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 22, 2015]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

Under the United States Department of Agriculture's California Raisin Marketing Order, a percentage of a grower's crop must be physically set aside in certain years for the account of the Government, free of charge. The Government then sells, allocates, or otherwise disposes of the raisins in ways it determines are best suited to maintaining an orderly market. The question is whether the Takings Clause of the Fifth Amendment bars the Government from imposing such a demand on the growers without just compensation.

I

The Agricultural Marketing Agreement Act of 1937 authorizes the Secretary of Agriculture to promulgate "marketing orders" to help maintain stable markets for particular agricultural products. The marketing order for raisins requires growers in certain years to give a percentage of their crop to the Government, free of charge. The required allocation is determined by the Raisin Administrative Committee, a Government entity composed largely

of growers and others in the raisin business appointed by the Secretary of Agriculture. In 2002–2003, this Committee ordered raisin growers to turn over 47 percent of their crop. In 2003–2004, 30 percent.

Growers generally ship their raisins to a raisin "handler," who physically separates the raisins due the Government (called "reserve raisins"), pays the growers only for the remainder ("free-tonnage raisins"), and packs and sells the free-tonnage raisins. The Raisin Committee acquires title to the reserve raisins that have been set aside, and decides how to dispose of them in its discretion. It sells them in noncompetitive markets, for example to exporters, federal agencies, or foreign governments; donates them to charitable causes; releases them to growers who agree to reduce their raisin production; or disposes of them by "any other means" consistent with the purposes of the raisin program. 7 CFR §989.67(b)(5) (2015). Proceeds from Committee sales are principally used to subsidize handlers who sell raisins for export (not including the Hornes, who are not raisin exporters). Raisin growers retain an interest in any net proceeds from sales the Raisin Committee makes, after deductions for the export subsidies and the Committee's administrative expenses. In the years at issue in this case, those proceeds were less than the cost of producing the crop one year, and nothing at all the next.

The Hornes—Marvin Horne, Laura Horne, and their family—are both raisin growers and handlers. They "handled" not only their own raisins but also those produced by other growers, paying those growers in full for all of their raisins, not just the free-tonnage portion. In 2002, the Hornes refused to set aside any raisins for the Government, believing they were not legally bound to do so. The Government sent trucks to the Hornes' facility at eight o'clock one morning to pick up the raisins, but the Hornes refused entry. App. 31; cf. *post,* at 11

(SOTOMAYOR, J., dissenting). The Government then assessed against the Hornes a fine equal to the market value of the missing raisins—some $480,000—as well as an additional civil penalty of just over $200,000 for disobeying the order to turn them over.

When the Government sought to collect the fine, the Hornes turned to the courts, arguing that the reserve requirement was an unconstitutional taking of their property under the Fifth Amendment. Their case eventually made it to this Court when the Government argued that the lower courts had no jurisdiction to consider the Hornes' constitutional defense to the fine. *Horne* v. *Department of Agriculture*, 569 U. S. ___ (2013) (*Horne I*). We rejected the Government's argument and sent the case back to the Court of Appeals so it could address the Hornes' contention on the merits. *Id.*, at ___ (slip op., at 15).

On remand, the Ninth Circuit agreed with the Hornes that the validity of the fine rose or fell with the constitutionality of the reserve requirement. 750 F. 3d 1128, 1137 (2014). The court then considered whether that requirement was a physical appropriation of property, giving rise to a *per se* taking, or a restriction on a raisin grower's use of his property, properly analyzed under the more flexible and forgiving standard for a regulatory taking. The court rejected the Hornes' argument that the reserve requirement was a *per se* taking, reasoning that "the Takings Clause affords less protection to personal than to real property," and concluding that the Hornes "are not completely divested of their property rights," because growers retain an interest in the proceeds from any sale of reserve raisins by the Raisin Committee. *Id.*, at 1139.

The court instead viewed the reserve requirement as a use restriction, similar to a government condition on the grant of a land use permit. See *Dolan* v. *City of Tigard*, 512 U. S. 374 (1994); *Nollan* v. *California Coastal*

*Comm'n*, 483 U. S. 825 (1987). As in such permit cases, the Court of Appeals explained, the Government here imposed a condition (the reserve requirement) in exchange for a Government benefit (an orderly raisin market). And just as a landowner was free to avoid the government condition by forgoing a permit, so too the Hornes could avoid the reserve requirement by "planting different crops." 750 F. 3d, at 1143. Under that analysis, the court found that the reserve requirement was a proportional response to the Government's interest in ensuring an orderly raisin market, and not a taking under the Fifth Amendment.

We granted certiorari. 574 U. S. ___ (2015).

## II

The petition for certiorari poses three questions, which we answer in turn.

## A

The first question presented asks "Whether the government's 'categorical duty' under the Fifth Amendment to pay just compensation when it 'physically takes possession of an interest in property,' *Arkansas Game & Fish Comm'n v. United States*, 133 S. Ct. 511, 518 (2012), applies only to real property and not to personal property." The answer is no.

### 1

There is no dispute that the "classic taking [is one] in which the government directly appropriates private property for its own use." *Tahoe-Sierra Preservation Council, Inc.* v. *Tahoe Regional Planning Agency*, 535 U. S. 302, 324 (2002) (brackets and internal quotation marks omitted). Nor is there any dispute that, in the case of real property, such an appropriation is a *per se* taking that requires just compensation. See *Loretto* v. *Teleprompter Manhattan CATV Corp.*, 458 U. S. 419, 426–435 (1982).

Nothing in the text or history of the Takings Clause, or our precedents, suggests that the rule is any different when it comes to appropriation of personal property. The Government has a categorical duty to pay just compensation when it takes your car, just as when it takes your home.

The Takings Clause provides: "[N]or shall private property be taken for public use, without just compensation." U. S. Const., Amdt. 5. It protects "private property" without any distinction between different types. The principle reflected in the Clause goes back at least 800 years to Magna Carta, which specifically protected agricultural crops from uncompensated takings. Clause 28 of that charter forbade any "constable or other bailiff" from taking "corn or other provisions from any one without immediately tendering money therefor, unless he can have postponement thereof by permission of the seller." Cl. 28 (1215), in W. McKechnie, Magna Carta, A Commentary on the Great Charter of King John 329 (2d ed. 1914).

The colonists brought the principles of Magna Carta with them to the New World, including that charter's protection against uncompensated takings of personal property. In 1641, for example, Massachusetts adopted its Body of Liberties, prohibiting "mans Cattel or goods of what kinde soever" from being "pressed or taken for any publique use or service, unlesse it be by warrant grounded upon some act of the generall Court, nor without such reasonable prices and hire as the ordinarie rates of the Countrie do afford." Massachusetts Body of Liberties ¶8, in R. Perry, Sources of Our Liberties 149 (1978). Virginia allowed the seizure of surplus "live stock, or beef, pork, or bacon" for the military, but only upon "paying or tendering to the owner the price so estimated by the appraisers." 1777 Va. Acts ch. XII. And South Carolina authorized the seizure of "necessaries" for public use, but provided that "said articles so seized shall be paid for agreeable to the

prices such and the like articles sold for on the ninth day of October last."  1779 S. C. Acts §4.

Given that background, it is not surprising that early Americans bridled at appropriations of their personal property during the Revolutionary War, at the hands of both sides.  John Jay, for example, complained to the New York Legislature about military impressment by the Continental Army of "Horses, Teems, and Carriages," and voiced his fear that such action by the "little Officers" of the Quartermasters Department might extend to "Blankets, Shoes, and many other articles."  A Hint to the Legislature of the State of New York (1778), in John Jay, The Making of a Revolutionary 461–463 (R. Morris ed. 1975) (emphasis deleted).  The legislature took the "hint," passing a law that, among other things, provided for compensation for the impressment of horses and carriages.  1778 N. Y. Laws ch. 29.  According to the author of the first treatise on the Constitution, St. George Tucker, the Takings Clause was "probably" adopted in response to "the arbitrary and oppressive mode of obtaining supplies for the army, and other public uses, by impressment, as was too frequently practised during the revolutionary war, without any compensation whatever."   1 Blackstone's Commentaries, Editor's App. 305–306 (1803).

Nothing in this history suggests that personal property was any less protected against physical appropriation than real property.  As this Court summed up in *James* v. *Campbell*, 104 U. S. 356, 358 (1882), a case concerning the alleged appropriation of a patent by the Government:

> "[A patent] confers upon the patentee an exclusive property in the patented invention which cannot be appropriated or used by the government itself, without just compensation, any more than it can appropriate or use without compensation land which has been patented to a private purchaser."

Prior to this Court's decision in *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S. 393 (1922), the Takings Clause was understood to provide protection only against a direct appropriation of property—personal or real. *Pennsylvania Coal* expanded the protection of the Takings Clause, holding that compensation was also required for a "regulatory taking"—a restriction on the use of property that went "too far." *Id.*, at 415. And in *Penn Central Transp. Co.* v. *New York City*, 438 U. S. 104, 124 (1978), the Court clarified that the test for how far was "too far" required an "ad hoc" factual inquiry. That inquiry required considering factors such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action.

Four years after *Penn Central*, however, the Court reaffirmed the rule that a physical *appropriation* of property gave rise to a *per se* taking, without regard to other factors. In *Loretto*, the Court held that requiring an owner of an apartment building to allow installation of a cable box on her rooftop was a physical taking of real property, for which compensation was required. That was true without regard to the claimed public benefit or the economic impact on the owner. The Court explained that such protection was justified not only by history, but also because "[s]uch an appropriation is perhaps the most serious form of invasion of an owner's property interests," depriving the owner of the "the rights to possess, use and dispose of" the property. 458 U. S., at 435 (internal quotation marks omitted). That reasoning—both with respect to history and logic—is equally applicable to a physical appropriation of personal property.

The Ninth Circuit based its distinction between real and personal property on this Court's discussion in *Lucas* v. *South Carolina Coastal Council*, 505 U. S. 1003 (1992), a case involving extensive limitations on the use of shorefront property. 750 F. 3d, at 1139–1141. *Lucas* recognized

that while an owner of personal property "ought to be aware of the possibility that new regulation might even render his property economically worthless," such an "implied limitation" was not reasonable in the case of land. 505 U. S., at 1027–1028.

*Lucas*, however, was about regulatory takings, not direct appropriations. Whatever *Lucas* had to say about reasonable expectations with regard to regulations, people still do not expect their property, real or personal, to be actually occupied or taken away. Our cases have stressed the "longstanding distinction" between government acquisitions of property and regulations. *Tahoe-Sierra Preservation Council*, 535 U. S., at 323. The different treatment of real and personal property in a regulatory case suggested by *Lucas* did not alter the established rule of treating direct appropriations of real and personal property alike. See 535 U. S., at 323. (It is "inappropriate to treat cases involving physical takings as controlling precedents for the evaluation of a claim that there has been a 'regulatory taking,' and vice versa" (footnote omitted)).

2

The reserve requirement imposed by the Raisin Committee is a clear physical taking. Actual raisins are transferred from the growers to the Government. Title to the raisins passes to the Raisin Committee. App. to Pet. for Cert. 179a; Tr. of Oral Arg. 31. The Committee's raisins must be physically segregated from free-tonnage raisins. 7 CFR §989.66(b)(2). Reserve raisins are sometimes left on the premises of handlers, but they are held "for the account" of the Government. §989.66(a). The Committee disposes of what become its raisins as it wishes, to promote the purposes of the raisin marketing order.

Raisin growers subject to the reserve requirement thus lose the entire "bundle" of property rights in the appropriated raisins—"the rights to possess, use and dispose of"

them, *Loretto*, 458 U. S., at 435 (internal quotation marks omitted)—with the exception of the speculative hope that some residual proceeds may be left when the Government is done with the raisins and has deducted the expenses of implementing all aspects of the marketing order. The Government's "actual taking of possession and control" of the reserve raisins gives rise to a taking as clearly "as if the Government held full title and ownership," *id.*, at 431 (internal quotation marks omitted), as it essentially does. The Government's formal demand that the Hornes turn over a percentage of their raisin crop without charge, for the Government's control and use, is "of such a unique character that it is a taking without regard to other factors that a court might ordinarily examine." *Id.*, at 432.

The Government thinks it "strange" and the dissent "baffling" that the Hornes object to the reserve requirement, when they nonetheless concede that "the government may prohibit the sale of raisins without effecting a per se taking." Brief for Respondent 35; *post,* at 12 (SOTOMAYOR, J., dissenting). But that distinction flows naturally from the settled difference in our takings jurisprudence between appropriation and regulation. A physical taking of raisins and a regulatory limit on production may have the same economic impact on a grower. The Constitution, however, is concerned with means as well as ends. The Government has broad powers, but the means it uses to achieve its ends must be "consist[ent] with the letter and spirit of the constitution." *McCulloch* v. *Maryland*, 4 Wheat. 316, 421 (1819). As Justice Holmes noted, "a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way." *Pennsylvania Coal*, 260 U. S., at 416.

## B

The second question presented asks "Whether the gov-

ernment may avoid the categorical duty to pay just compensation for a physical taking of property by reserving to the property owner a contingent interest in a portion of the value of the property, set at the government's discretion." The answer is no.

The Government and dissent argue that raisins are fungible goods whose only value is in the revenue from their sale. According to the Government, the raisin marketing order leaves that interest with the raisin growers: After selling reserve raisins and deducting expenses and subsidies for exporters, the Raisin Committee returns any net proceeds to the growers. 7 CFR §§989.67(d), 989.82, 989.53(a), 989.66(h). The Government contends that because growers are entitled to these net proceeds, they retain the most important property interest in the reserve raisins, so there is no taking in the first place. The dissent agrees, arguing that this possible future revenue means there has been no taking under *Loretto*. See *post,* at 2–6.

But when there has been a physical appropriation, "we do not ask . . . whether it deprives the owner of all economically valuable use" of the item taken. *Tahoe-Sierra Preservation Council,* 535 U. S., at 323; see *id.,* at 322 ("When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof." (citation omitted)). For example, in *Loretto*, we held that the installation of a cable box on a small corner of Loretto's rooftop was a *per se* taking, even though she could of course still sell and economically benefit from the property. 458 U. S., at 430, 436. The fact that the growers retain a contingent interest of indeterminate value does not mean there has been no physical taking, particularly since the value of the interest depends on the discretion of the taker, and may be worthless, as it was for one of the two years at issue here.

The dissent points to *Andrus* v. *Allard*, 444 U. S. 51 (1979), noting that the Court found no taking in that case, even though the owners' artifacts could not be sold at all. *Post*, at 6. The dissent suggests that the Hornes should be happy, because they might at least get *something* from what had been their raisins. But *Allard* is a very different case. As the dissent recognizes, the owners in that case retained the rights to possess, donate, and devise their property. In finding no taking, the Court emphasized that the Government did not "compel the surrender of the artifacts, and there [was] no physical invasion or restraint upon them." 444 U. S*.,* at 65–66. Here of course the raisin program requires physical surrender of the raisins and transfer of title, and the growers lose any right to control their disposition.

The Government and dissent again confuse our inquiry concerning *per se* takings with our analysis for regulatory takings. A regulatory restriction on use that does not entirely deprive an owner of property rights may not be a taking under *Penn Central*. That is why, in *PruneYard Shopping Center* v. *Robins*, 447 U. S. 74 (1980), we held that a law limiting a property owner's right to exclude certain speakers from an already publicly accessible shopping center did not take the owner's property. The owner retained the value of the use of the property as a shopping center largely unimpaired, so the regulation did not go "too far." *Id.*, at 83 (quoting *Pennsylvania Coal Co.*, 260 U. S., at 415). But once there is a taking, as in the case of a physical appropriation, any payment from the Government in connection with that action goes, at most, to the question of just compensation. See *Suitum* v. *Tahoe Regional Planning Agency*, 520 U. S. 725, 747–748 (1997) (SCALIA, J., concurring in part and concurring in judgment). That is not an issue here: The Hornes did not receive any net proceeds from Raisin Committee sales for the years at issue, because they had not set aside any

reserve raisins in those years (and, in any event, there were no net proceeds in one of them).

C

The third question presented asks "Whether a governmental mandate to relinquish specific, identifiable property as a 'condition' on permission to engage in commerce effects a per se taking." The answer, at least in this case, is yes.

The Government contends that the reserve requirement is not a taking because raisin growers voluntarily choose to participate in the raisin market. According to the Government, if raisin growers don't like it, they can "plant different crops," or "sell their raisin-variety grapes as table grapes or for use in juice or wine." Brief for Respondent 32 (brackets and internal quotation marks omitted).

"Let them sell wine" is probably not much more comforting to the raisin growers than similar retorts have been to others throughout history. In any event, the Government is wrong as a matter of law. In *Loretto*, we rejected the argument that the New York law was not a taking because a landlord could avoid the requirement by ceasing to be a landlord. We held instead that "a landlord's ability to rent his property may not be conditioned on his forfeiting the right to compensation for a physical occupation." 458 U. S., at 439, n. 17. As the Court explained, the contrary argument "proves too much":

> "For example, it would allow the government to require a landlord to devote a substantial portion of his building to vending and washing machines, with all profits to be retained by the owners of these services and with no compensation for the deprivation of space. It would even allow the government to requisition a certain number of apartments as permanent government offices." *Ibid.*

As the Court concluded, property rights "cannot be so easily manipulated." *Ibid.*

The Government and dissent rely heavily on *Ruckelshaus* v. *Monsanto Co.*, 467 U. S. 986 (1984). There we held that the Environmental Protection Agency could require companies manufacturing pesticides, fungicides, and rodenticides to disclose health, safety, and environmental information about their products as a condition to receiving a permit to sell those products. While such information included trade secrets in which pesticide manufacturers had a property interest, those manufacturers were not subjected to a taking because they received a "valuable Government benefit" in exchange—a license to sell dangerous chemicals. *Id.,* at 1007; see *Nollan*, 483 U. S., at 834, n. 2 (discussing *Monsanto*).

The taking here cannot reasonably be characterized as part of a similar voluntary exchange. In one of the years at issue here, the Government insisted that the Hornes turn over 47 percent of their raisin crop, in exchange for the "benefit" of being allowed to sell the remaining 53 percent. The next year, the toll was 30 percent. We have already rejected the idea that *Monsanto* may be extended by regarding basic and familiar uses of property as a "Government benefit" on the same order as a permit to sell hazardous chemicals. See *Nollan*, 483 U. S., at 834, n. 2 (distinguishing *Monsanto* on the ground that "the right to build on one's own property—even though its exercise can be subjected to legitimate permitting requirements— cannot remotely be described as a 'governmental benefit'"). Selling produce in interstate commerce, although certainly subject to reasonable government regulation, is similarly not a special governmental benefit that the Government may hold hostage, to be ransomed by the waiver of constitutional protection. Raisins are not dangerous pesticides; they are a healthy snack. A case about conditioning the sale of hazardous substances on disclo-

sure of health, safety, and environmental information related to those hazards is hardly on point.

*Leonard & Leonard* v. *Earle*, 279 U. S. 392 (1929), is also readily distinguishable. In that case, the Court upheld a Maryland requirement that oyster packers remit ten percent of the marketable detached oyster shells or their monetary equivalent to the State for the privilege of harvesting the oysters. But the packers did "not deny the power of the State to declare their business a privilege," and the power of the State to impose a "privilege tax" was "not questioned by counsel." *Id.*, at 396. The oysters, unlike raisins, were "feræ naturæ" that belonged to the State under state law, and "[n]o individual ha[d] any property rights in them other than such as the state may permit him to acquire." *Leonard* v. *Earle*, 155 Md. 252, 258, 141 A. 714, 716 (1928). The oyster packers did not simply seek to sell their property; they sought to appropriate the State's. Indeed, the Maryland Court of Appeals saw the issue as a question of "a reasonable and fair compensation" *from* the packers *to* "the state, as owner of the oysters." *Id.*, at 259, 141 A., at 717 (internal quotation marks omitted).

Raisins are not like oysters: they are private property—the fruit of the growers' labor—not "public things subject to the absolute control of the state," *id.*, at 258, 141 A., at 716. Any physical taking of them for public use must be accompanied by just compensation.

### III

The Government correctly points out that a taking does not violate the Fifth Amendment unless there is no just compensation, and argues that the Hornes are free to seek compensation for any taking by bringing a damages action under the Tucker Act in the Court of Federal Claims. See 28 U. S. C. §1491(a)(1); *Monsanto*, 467 U. S., at 1020. But we held in *Horne I* that the Hornes may, in their capacity

as handlers, raise a takings-based defense to the fine levied against them. We specifically rejected the contention that the Hornes were required to pay the fine and then seek compensation under the Tucker Act. See 569 U. S., at \_\_\_ (slip op., at 13–14) ("We . . . conclude that the [Agricultural Marketing Agreement Act] withdraws Tucker Act jurisdiction over [the Hornes'] takings claim. [The Hornes] (as handlers) have no alternative remedy, and their takings claim was not 'premature' when presented to the Ninth Circuit.").

As noted, the Hornes are both growers and handlers. Their situation is unusual in that, as handlers, they have the full economic interest in the raisins the Government alleges should have been set aside for its account. They own the raisins they grew and are handling for themselves, and they own the raisins they handle for other growers, having paid those growers for all their raisins (not just the free-tonnage amount, as is true with respect to most handlers). See *supra*, at 2–3; Tr. of Oral Arg. 3–4. The penalty assessed against them as handlers included the dollar equivalent of the raisins they refused to set aside—their raisins. 750 F. 3d, at 1135, n. 6; Brief for Petitioners 15. They may challenge the imposition of that fine, and do not have to pay it first and then resort to the Court of Federal Claims.

Finally, the Government briefly argues that if we conclude that the reserve requirement effects a taking, we should remand for the Court of Appeals to calculate "what compensation would have been due if petitioners had complied with the reserve requirement." Brief for Respondent 55. The Government contends that the calculation must consider what the value of the reserve raisins would have been without the price support program, as well as "other benefits . . . from the regulatory program, such as higher consumer demand for raisins spurred by enforcement of quality standards and promotional activi-

ties." *Id.*, at 55–56. Indeed, according to the Government, the Hornes would "likely" have a net gain under this theory. *Id.*, at 56.

The best defense may be a good offense, but the Government cites no support for its hypothetical-based approach, or its notion that general regulatory activity such as enforcement of quality standards can constitute just compensation for a specific physical taking. Instead, our cases have set forth a clear and administrable rule for just compensation: "The Court has repeatedly held that just compensation normally is to be measured by 'the market value of the property at the time of the taking.' " *United States* v. *50 Acres of Land*, 469 U. S. 24, 29 (1984) (quoting *Olson* v. *United States*, 292 U. S. 246, 255 (1934)).

JUSTICE BREYER is concerned that applying this rule in this case will affect provisions concerning whether a condemning authority may deduct special benefits—such as new access to a waterway or highway, or filling in of swampland—from the amount of compensation it seeks to pay a landowner suffering a partial taking. *Post*, at 5 (opinion concurring in part and dissenting in part); see *Bauman* v. *Ross*, 167 U. S. 548 (1897) (laying out of streets and subdivisions in the District of Columbia). He need not be. Cases of that sort can raise complicated questions involving the exercise of the eminent domain power, but they do not create a generally applicable exception to the usual compensation rule, based on asserted regulatory benefits of the sort at issue here. Nothing in the cases JUSTICE BREYER labels "*Bauman* and its progeny," *post,* at 5, suggests otherwise, which may be why the Solicitor General does not cite them.*

———————

*For example, in *United States* v. *Miller*, 317 U. S. 369, 377 (1943), the Court—in calculating the fair market value of land—discounted an increase in value resulting from speculation "as to what the Govern-

Opinion of the Court

In any event, this litigation presents no occasion to consider the broader issues discussed by JUSTICE BREYER. The Government has already calculated the amount of just compensation in this case, when it fined the Hornes the fair market value of the raisins: $483,843.53. 750 F. 3d, at 1135, n. 6. The Government cannot now disavow that valuation, see Reply Brief 21–23, and does not suggest that the marketing order affords the Hornes compensation in that amount. There is accordingly no need for a remand; the Hornes should simply be relieved of the obligation to pay the fine and associated civil penalty they were assessed when they resisted the Government's effort to

---

ment would be compelled to pay as compensation" after the land was earmarked for acquisition. In *United States* v. *Sponenbarger*, 308 U. S. 256, 265 (1939), the Court determined there was no taking in the first place, when the complaint was merely that a Government flood control plan provided insufficient protection for the claimant's land. *McCoy* v. *Union Elevated R. Co.*, 247 U. S. 354, 363 (1918), similarly involved a claim "for damages to property not actually taken." So too *Reichelderfer* v. *Quinn*, 287 U. S. 315 (1932). There the Court held that claimants who had paid a special assessment when Rock Creek Park in Washington, D. C., was created—because the Park increased the value of their property—did not thereby have the right to prevent Congress from altering use of part of the Park for a fire station 38 years later. In *Dohany* v. *Rogers*, 281 U. S. 362 (1930), the law authorizing the taking did "not permit the offset of benefits for a railroad," and therefore was "not subject to the objection that it fails to provide adequate compensation . . . and is therefore unconstitutional." *Id.,* at 367, and n. 1 (quoting *Fitzsimons & Galvin, Inc.* v. *Rogers*, 243 Mich. 649, 665, 220 N. W. 881, 886 (1928)). And in *Norwood* v. *Baker*, 172 U. S. 269 (1898), the issue was whether an assessment to pay for improvements exceeded a village's taxing power. Perhaps farthest afield are the *Regional Rail Reorganization Act Cases*, 419 U. S. 102, 153 (1974), which involved valuation questions arising from the Government reorganization of northeast and midwest railroads. The Court in that case held that the legislation at issue was not "merely an eminent domain statute" but instead was enacted "pursuant to the bankruptcy power." *Id.,* at 151, 153.

take their raisins.  This case, in litigation for more than a decade, has gone on long enough.

The judgment of the United States Court of Appeals for the Ninth Circuit is reversed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

―――――――

No. 14–275

―――――――

## MARVIN D. HORNE, ET AL., PETITIONERS *v.* DEPARTMENT OF AGRICULTURE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 22, 2015]

JUSTICE THOMAS, concurring.

I join the Court's opinion in full. I write separately to offer an additional observation concerning JUSTICE BREYER's argument that we should remand the case. The Takings Clause prohibits the government from taking private property except "for public use," even when it offers "just compensation." U. S. Const., Amdt. 5. That requirement, as originally understood, imposes a meaningful constraint on the power of the state—"the government may take property only if it actually uses or gives the public a legal right to use the property." *Kelo* v. *New London*, 545 U. S. 469, 521 (2005) (THOMAS, J., dissenting). It is far from clear that the Raisin Administrative Committee's conduct meets that standard. It takes the raisins of citizens and, among other things, gives them away or sells them to exporters, foreign importers, and foreign governments. 7 CFR §989.67(b) (2015). To the extent that the Committee is not taking the raisins "for public use," having the Court of Appeals calculate "just compensation" in this case would be a fruitless exercise.

# SUPREME COURT OF THE UNITED STATES

_____

No. 14–275

_____

MARVIN D. HORNE, ET AL., PETITIONERS *v.*
DEPARTMENT OF AGRICULTURE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 22, 2015]

JUSTICE BREYER, with whom JUSTICE GINSBURG and JUSTICE KAGAN join, concurring in part and dissenting in part.

I agree with Parts I and II of the Court's opinion. However, I cannot agree with the Court's rejection, in Part III, of the Government's final argument. The Government contends that we should remand the case for a determination of whether any compensation would have been due if the Hornes had complied with the California Raisin Marketing Order's reserve requirement. In my view, a remand for such a determination is necessary.

The question of just compensation was not presented in the Hornes' petition for certiorari. It was barely touched on in the briefs. And the courts below did not decide it. At the same time, the case law that I have found indicates that the Government may well be right: The marketing order may afford just compensation for the takings of raisins that it imposes. If that is correct, then the reserve requirement does not violate the Takings Clause.

## I

The Takings Clause of the Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." The Clause means what it says: It "does not proscribe the taking of property; it proscribes taking *without just compensation*." *Williamson*

*County Regional Planning Comm'n* v. *Hamilton Bank of Johnson City*, 473 U. S. 172, 194 (1985) (emphasis added). Under the Clause, a property owner "is entitled to be put in as good a position pecuniarily as if his property had not been taken," which is to say that "[h]e must be made whole but is not entitled to more." *Olson* v. *United States*, 292 U. S. 246, 255 (1934).

On the record before us, the Hornes have not established that the Government, through the raisin reserve program, takes raisins *without just compensation*. When the Government takes as reserve raisins a percentage of the annual crop, the raisin owners retain the remaining, free-tonnage, raisins. The reserve requirement is intended, at least in part, to enhance the price that free-tonnage raisins will fetch on the open market. See 7 CFR §989.55 (2015); 7 U. S. C. §602(1). And any such enhancement matters. This Court's precedents indicate that, when calculating the just compensation that the Fifth Amendment requires, a court should deduct from the value of the taken (reserve) raisins any enhancement caused by the taking to the value of the remaining (free-tonnage) raisins.

More than a century ago, in *Bauman* v. *Ross*, 167 U. S. 548 (1897), this Court established an exception to the rule that "just compensation normally is to be measured by 'the market value of the property at the time of the taking.'" *United States* v. *50 Acres of Land*, 469 U. S. 24, 29 (1984) (quoting *Olson, supra,* at 255). We considered in *Bauman* how to calculate just compensation when the Government takes only a portion of a parcel of property:

> "[W]hen part only of a parcel of land is taken for a highway, the value of that part is not the sole measure of the compensation or damages to be paid to the owner; but the incidental injury or benefit to the part not taken is also to be considered. When the part not taken is left in such shape or condition, as to be in it-

self of less value than before, the owner is entitled to
additional damages on that account.  When, on the
other hand, the part which he retains is specially and
directly increased in value by the public improvement,
the damages to the whole parcel by the appropriation
of part of it are lessened."  167 U. S., at 574.

"The Constitution of the United States," the Court stated,
"contains no express prohibition against considering bene-
fits in estimating the just compensation to be paid for
private property taken for the public use."  *Id.,* at 584.

The Court has consistently applied this method for
calculating just compensation: It sets off from the value of
the portion that was taken the value of any benefits con-
ferred upon the remaining portion of the property.  See
*Regional Rail Reorganization Act Cases,* 419 U. S. 102,
151 (1974) ("[C]onsideration other than cash—for example,
any special benefits to a property owner's remaining prop-
erties—may be counted in the determination of just com-
pensation" (footnote omitted)); *United States* v. *Miller*, 317
U. S. 369, 376 (1943) ("[I]f the taking has in fact benefitted
the remainder, the benefit may be set off against the value
of the land taken"); *United States* v. *Sponenbarger*, 308
U. S. 256, 266–267 (1939) ("[I]f governmental activities
inflict slight damage upon land in one respect and actually
confer great benefits when measured in the whole, to
compensate the landowner further would be to grant him
a special bounty.  Such activities in substance take noth-
ing from the landowner"); *Reichelderfer* v. *Quinn*, 287
U. S. 315, 323 (1932) ("Just compensation . . . was awarded
if the benefits resulting from the proximity of the im-
provement [were] set off against the value of the property
taken from the same owners"); *Dohany* v. *Rogers*, 281
U. S. 362, 367–368 (1930) (a statute that "permits deduc-
tion of benefits derived from the construction of a high-
way" from the compensation paid to landowners "afford[s]

no basis for anticipating that . . . just compensation will be denied"); *Norwood* v. *Baker*, 172 U. S. 269, 277 (1898) ("Except for [state law], the State could have authorized benefits to be deducted from the actual value of the land taken, without violating the constitutional injunction that compensation be made for private property taken for public use; for the benefits received could be properly regarded as compensation *pro tanto* for the property appropriated to public use").

The rule applies regardless of whether a taking enhances the value of one property or the value of many properties. That is to say, the Government may "permi[t] consideration of actual benefits—enhancement in market value—flowing directly from a public work, although all in the neighborhood receive like advantages." *McCoy* v. *Union Elevated R. Co.*, 247 U. S. 354, 366 (1918). The Federal Constitution does not distinguish between "special" benefits, which specifically affect the property taken, and "general" benefits, which have a broader impact.

Of course, a State may prefer to guarantee a greater payment to property owners, for instance by establishing a standard for compensation that does not account for general benefits (or for any benefits) afforded to a property owner by a taking. See *id.,* at 365 (describing categories of rules applied in different jurisdictions); Schopflocher, Deduction of Benefits in Determining Compensation or Damages in Eminent Domain, 145 A. L. R. 7, 158–294 (1943) (describing particular rules applied in different jurisdictions). Similarly, "Congress . . . has the power to authorize compensation greater than the constitutional minimum." *50 Acres of Land*, *supra*, at 30, n. 14 (1984). Thus, Congress, too, may limit the types of benefits to be considered. See, *e.g.,* 33 U. S. C. §595. But I am unaware of any congressional authorization that would increase beyond the constitutional floor the compensation owed for a taking of the Hornes' raisins.

If we apply *Bauman* and its progeny to the marketing order's reserve requirement, "the benefit [to the free-tonnage raisins] may be set off against the value of the [reserve raisins] taken." *Miller*, *supra,* at 376. The value of the raisins taken might exceed the value of the benefit conferred. In that case, the reserve requirement effects a taking without just compensation, and the Hornes' decision not to comply with the requirement was justified. On the other hand, the benefit might equal or exceed the value of the raisins taken. In that case, the California Raisin Marketing Order does not effect a taking without just compensation. See *McCoy, supra,* at 366 ("In such [a] case the owner really loses nothing which he had before; and it may be said with reason, there has been no real injury"); *Brown* v. *Legal Foundation of Wash.*, 538 U. S. 216, 237 (2003) ("[I]f petitioners' net loss was zero, the compensation that is due is also zero"). And even the Hornes agree that if the reserve requirement does not effect a taking without just compensation, then they cannot use the Takings Clause to excuse their failure to comply with the marketing order—or to justify their refusal to pay the fine and penalty imposed based on that failure. See Brief for Petitioners 31 ("The constitutionality of the fine rises or falls on the constitutionality of the Marketing Order's reserve requirement and attendant transfer of reserve raisins" (internal quotation marks omitted)).

## II

The majority believes the *Bauman* line of cases most likely does not apply here. It says that those cases do "not create a generally applicable exception to the usual compensation rule, based on asserted regulatory benefits of the sort at issue here." *Ante,* at 16. But it is unclear to me what distinguishes this case from those.

It seems unlikely that the majority finds a distinction in the fact that this taking is based on regulatory authority. Cf. *Chrysler Corp.* v. *Brown*, 441 U. S. 281, 295 (1979) ("It

has been established in a variety of contexts that properly promulgated, substantive agency regulations have the force and effect of law" (internal quotation marks omitted)).  It similarly seems unlikely that the majority intends to distinguish between takings of real property and takings of personal property, given its recognition that the Takings Clause "protects 'private property' without any distinction between different types." *Ante,* at 5.  It is possible that the majority questions the Government's argument because of its breadth—the Government argues that "it would be appropriate to consider what value all of the raisins would have had *in the absence of the marketing order*," and I am unaware of any precedent that allows a court to account for portions of the marketing order that are entirely separate from the reserve requirement.  But neither am I aware of any precedent that would distinguish between how the *Bauman* doctrine applies to the reserve requirement itself and how it applies to other types of partial takings.

Ultimately, the majority rejects the Government's request for a remand because it believes that the Government "does not suggest that the marketing order affords the Hornes compensation" in the amount of the fine that the Government assessed.  *Ante,* at 17.  In my view, however, the relevant precedent indicates that the Takings Clause requires compensation in an amount equal to the value of the reserve raisins adjusted to account for the benefits received.  And the Government does, indeed, suggest that the marketing order affords just compensation.  See Brief for Respondent 56 ("It is likely that when all benefits and alleged losses from the marketing order are calculated, [the Hornes] would have a net *gain* rather than a net loss, given that a central point of the order is to benefit producers").  Further, the Hornes have not demonstrated the contrary.  Before granting judgment in favor of the Hornes, a court should address the issue in light of all

of the relevant facts and law.

\*    \*    \*

Given the precedents, the parties should provide full briefing on this question. I would remand the case, permitting the lower courts to consider argument on the question of just compensation.

For these reasons, while joining Parts I and II of the Court's opinion, I respectfully dissent from Part III.

# SUPREME COURT OF THE UNITED STATES

No. 14–275

MARVIN D. HORNE, ET AL., PETITIONERS *v.*
DEPARTMENT OF AGRICULTURE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 22, 2015]

JUSTICE SOTOMAYOR, dissenting.

The Hornes claim, and the Court agrees, that the Raisin Marketing Order, 7 CFR pt. 989 (2015) (hereinafter Order), effects a *per se* taking under our decision in *Loretto* v. *Teleprompter Manhattan CATV Corp.*, 458 U. S. 419 (1982). But *Loretto* sets a high bar for such claims: It requires that each and every property right be destroyed by governmental action before that action can be said to have effected a *per se* taking. Because the Order does not deprive the Hornes of all of their property rights, it does not effect a *per se* taking. I respectfully dissent from the Court's contrary holding.

I

Our Takings Clause jurisprudence has generally eschewed "magic formula[s]" and has "recognized few invariable rules." *Arkansas Game and Fish Comm'n* v. *United States*, 568 U. S. \_\_\_, \_\_\_–\_\_\_ (2012) (slip op., at 6–7). Most takings cases therefore proceed under the fact-specific balancing test set out in *Penn Central Transp. Co.* v. *New York City*, 438 U. S. 104 (1978). See *Arkansas Game and Fish Comm'n*, 568 U. S., at \_\_\_ (slip op., at 7); *Lingle* v. *Chevron U. S. A. Inc.*, 544 U. S. 528, 538–539 (2005). The Hornes have not made any argument under *Penn Central*. In order to prevail, they therefore must fit

their claim into one of the three narrow categories in which we have assessed takings claims more categorically.

In the "special context of land-use exactions," we have held that "government demands that a landowner dedicate an easement allowing public access to her property as a condition of obtaining a development permit" constitute takings unless the government demonstrates a nexus and rough proportionality between its demand and the impact of the proposed development. *Lingle,* 544 U. S., at 538, 546; see *Dolan* v. *City of Tigard*, 512 U. S. 374, 386, 391 (1994); *Nollan* v. *California Coastal Comm'n*, 483 U. S. 825, 837 (1987). We have also held that a regulation that deprives a property owner of "*all* economically beneficial us[e]" of his or her land is a *per se* taking. *Lucas* v. *South Carolina Coastal Council*, 505 U. S. 1003, 1019 (1992) (emphasis in original). The Hornes have not relied on either of these rules in this Court. See Brief for Petitioners 42, 55.

Finally—and this is the argument the Hornes do rely on—we have held that the government effects a *per se* taking when it requires a property owner to suffer a "permanent physical occupation" of his or her property. *Loretto*, 458 U. S., at 426. In my view, however, *Loretto*—when properly understood—does not encompass the circumstances of this case because it only applies where all property rights have been destroyed by governmental action. Where some property right is retained by the owner, no *per se* taking under *Loretto* has occurred.

This strict rule is apparent from the reasoning in *Loretto* itself. We explained that "[p]roperty rights in a physical thing have been described as the rights 'to possess, use and dispose of it.'" *Id.,* at 435 (quoting *United States* v. *General Motors Corp.*, 323 U. S. 373, 378 (1945)). A "permanent physical occupation" of property occurs, we said, when governmental action "destroys *each* of these rights." 458 U. S., at 435 (emphasis in original); see *ibid.,* n. 12

(requiring that an owner be "absolutely dispossess[ed]" of rights). When, as we held in *Loretto*, *each* of these rights is destroyed, the government has not simply "take[n] a single 'strand' from the 'bundle' of property rights"; it has "chop[ped] through the bundle" entirely. *Id.,* at 435. In the narrow circumstance in which a property owner has suffered this "most serious form of invasion of [his or her] property interests," a taking can be said to have occurred without any further showing on the property owner's part. *Ibid.*

By contrast, in the mine run of cases where governmental action impacts property rights in ways that do not chop through the bundle entirely, we have declined to apply *per se* rules and have instead opted for the more nuanced *Penn Central* test. See, *e.g., Hodel* v. *Irving*, 481 U. S. 704 (1987) (applying *Penn Central* to assess a requirement that title to land within Indian reservations escheat to the tribe upon the landowner's death); *PruneYard Shopping Center* v. *Robins*, 447 U. S. 74, 82–83 (1980) (engaging in similar analysis where there was "literally . . . a 'taking' of th[e] right" to exclude); *Kaiser Aetna* v. *United States*, 444 U. S. 164, 174–180 (1979) (applying *Penn Central* to find that the Government's imposition of a servitude requiring public access to a pond was a taking); see also *Loretto*, 458 U. S., at 433–434 (distinguishing *PruneYard* and *Kaiser Aetna*). Even governmental action that reduces the value of property or that imposes "a significant restriction . . . on one means of disposing" of property is not a *per se* taking; in fact, it may not even be a taking at all. *Andrus* v. *Allard*, 444 U. S. 51, 65–66 (1979).

What our jurisprudence thus makes plain is that a claim of a *Loretto* taking is a bold accusation that carries with it a heavy burden. To qualify as a *per se* taking under *Loretto*, the governmental action must be so completely destructive to the property owner's rights—all of them—as to render the ordinary, generally applicable protections of

the *Penn Central* framework either a foregone conclusion
or unequal to the task. Simply put, the retention of even
one property right that is not destroyed is sufficient to
defeat a claim of a *per se* taking under *Loretto*.

## II
## A

When evaluating the Order under this rubric, it is im-
portant to bear two things in mind. The first is that *Lor-
etto* is not concerned with whether the Order is a good idea
now, whether it was ever a good idea, or whether it in-
trudes upon some property rights. The Order may well be
an outdated, and by some lights downright silly, regula-
tion. It is also no doubt intrusive. But whatever else one
can say about the Order, it is not a *per se* taking if it does
not result in the destruction of every property right. The
second thing to keep in mind is the need for precision
about whose property rights are at issue and about what
property is at issue. Here, what is at issue are the Hornes'
property rights in the raisins they own and that are sub-
ject to the reserve requirement. The Order therefore
effects a *per se* taking under *Loretto* if and only if each of
the Hornes' property rights in the portion of raisins that
the Order designated as reserve has been destroyed. If
not, then whatever fate the Order may reach under some
other takings test, it is not a *per se* taking.

The Hornes, however, retain at least one meaningful
property interest in the reserve raisins: the right to re-
ceive some money for their disposition. The Order explic-
itly provides that raisin producers retain the right to "[t]he
net proceeds from the disposition of reserve tonnage rai-
sins," 7 CFR §989.66(h), and ensures that reserve raisins
will be sold "at prices and in a manner intended to max-
im[ize] producer returns," §989.67(d)(1). According to the
Government, of the 49 crop years for which a reserve pool
was operative, producers received equitable distributions

of net proceeds from the disposition of reserve raisins in 42. See Letter from Donald B. Verrilli, Jr., Solicitor General, to Scott S. Harris, Clerk of Court (Apr. 29, 2015).

Granted, this equitable distribution may represent less income than what some or all of the reserve raisins could fetch if sold in an unregulated market. In some years, it may even turn out (and has turned out) to represent no net income. But whether and when that occurs turns on market forces for which the Government cannot be blamed and to which all commodities—indeed, all property—are subject. In any event, we have emphasized that "a reduction in the value of property is not necessarily equated with a taking," *Andrus*, 444 U. S., at 66, that even "a significant restriction . . . imposed on one means of disposing" of property is not necessarily a taking, *id.,* at 65, and that not every "'injury to property by governmental action'" amounts to a taking, *PruneYard*, 447 U. S., at 82. Indeed, we would not have used the word "destroy" in *Loretto* if we meant "damaged" or even "substantially damaged." I take us at our word: *Loretto*'s strict requirement that all property interests be "destroy[ed]" by governmental action before that action can be called a *per se* taking cannot be satisfied if there remains a property interest that is at most merely damaged. That is the case here; accordingly, no *per se* taking has occurred.

Moreover, when, as here, the property at issue is a fungible commodity for sale, the income that the property may yield is the property owner's most central interest. Cf. *Ruckelshaus* v. *Monsanto Co.*, 467 U. S. 986, 1002 (1984) (noting that the "nature" of particular property defines "the extent of the property right therein"). "[A]rticles of commerce," in other words, are "desirable because [they are] convertible into money." *Leonard & Leonard* v. *Earle*, 279 U. S. 392, 396 (1929). The Hornes do not use the raisins that are subject to the reserve requirement—which are, again, the only raisins that have

allegedly been unlawfully taken—by eating them, feeding them to farm animals, or the like. They wish to use those reserve raisins by selling them, and they value those raisins only because they are a means of acquiring money. While the Order infringes upon the amount of that potential income, it does not inexorably eliminate it. Unlike the law in *Loretto,* see 458 U. S., at 436, the Order therefore cannot be said to have prevented the Hornes from making *any* use of the relevant property.

The conclusion that the Order does not effect a *per se* taking fits comfortably within our precedents. After all, we have observed that even "[r]egulations that bar trade in certain goods" altogether—for example, a ban on the sale of eagle feathers—may survive takings challenges. *Andrus,* 444 U. S., at 67. To be sure, it was important to our decision in *Andrus* that the regulation at issue did not prohibit the possession, donation, or devise of the property. See *id.,* at 66. But as to those feathers the plaintiffs would have liked to sell, the law said they could not be sold at any price—and therefore categorically could not be converted into money. Here, too, the Hornes may do as they wish with the raisins they are not selling. But as to those raisins that they would like to sell, the Order subjects a subset of them to the reserve requirement, which allows for the conversion of reserve raisins into at least *some* money and which is thus *more* generous than the law in *Andrus.* We held that no taking occurred in *Andrus,* so rejecting the Hornes' claim follows *a fortiori.*

We made this principle even clearer in *Lucas,* when we relied on *Andrus* and said that where, as here, "property's only economically productive use is sale or manufacture for sale," a regulation could even "render [that] property economically *worthless*" without effecting a *per se* taking. *Lucas,* 505 U. S., at 1027–1028 (citing *Andrus,* 444 U. S., at 66–67; emphasis added). The Order does not go nearly that far. It should easily escape our approbation, at least

where a *per se* takings claim is concerned.

### B

The fact that at least one property right is not destroyed by the Order is alone sufficient to hold that this case does not fall within the narrow confines of *Loretto*. But such a holding is also consistent with another line of cases that, when viewed together, teach that the government may require certain property rights to be given up as a condition of entry into a regulated market without effecting a *per se* taking.

First, in *Leonard & Leonard* v. *Earle*, 279 U. S. 392, we considered a state law that required those who wished to engage in the business of oyster packing to deliver to the State 10 percent of the empty oyster shells. We rejected the argument that this law effected a taking and held that it was "not materially different" from a tax upon the privilege of doing business in the State. *Id.,* at 396. "[A]s the packer lawfully could be required to pay that sum in money," we said, "nothing in the Federal Constitution prevents the State from demanding that he give up the same per cent. of such shells." *Ibid.*[1]

Next, in *Ruckelshaus* v. *Monsanto Co.*, 467 U. S. 986, we held that no taking occurred when a provision of the Federal Insecticide, Fungicide, and Rodenticide Act required companies that wished to sell certain pesticides to first submit sensitive data and trade secrets to the Environmental Protection Agency as part of a registration process. Even though the EPA was permitted to publicly disclose

---

[1] The Court attempts to distinguish *Leonard & Leonard* because it involved wild oysters, not raisins. *Ante*, at 14. That is not an inaccurate factual statement, but I do not find in *Leonard & Leonard* any suggestion that its holding turned on this or any other of the facts to which the Court now points. Indeed, the only citation the Court offers for these allegedly crucial facts is the Maryland Court of Appeals' opinion, not ours. See *ante*, at 14.

some of that submitted data—which would have had the effect of revealing trade secrets, thus substantially diminishing or perhaps even eliminating their value—we reasoned that, like the privilege tax in *Leonard & Leonard*, the disclosure requirement was the price Monsanto had to pay for "'the advantage of living and doing business in a civilized community.'" 467 U. S., at 1007 (quoting *Andrus*, 444 U. S., at 67; some internal quotation marks omitted). We offered nary a suggestion that the law at issue could be considered a *per se* taking, and instead recognized that "a voluntary submission of data by an applicant" in exchange for the ability to participate in a regulated market "can hardly be called a taking." 467 U. S., at 1007.[2]

Finally, in *Yee* v. *Escondido*, 503 U. S. 519 (1992), we addressed a mobile-home park rent-control ordinance that set rents at below-market rates. We held the ordinance did not effect a taking under *Loretto*, even when it was considered in conjunction with other state laws regarding eviction that effectively permitted tenants to remain at will, because it only regulated the terms of market participation. See 503 U. S., at 527–529.

Understood together, these cases demonstrate that the

——————

[2] The Court claims that *Monsanto* is distinguishable for three reasons, none of which hold up. First, it seems, the Court believes the degree of the intrusion on property rights is greater here than in *Monsanto*. See *ante*, at 13. Maybe, maybe not. But nothing in *Monsanto* suggests this is a relevant question, and the Court points to nothing saying that it is. Second, the Court believes that "[s]elling produce in interstate commerce" is not a government benefit. *Ante*, at 13. Again, that may be true, but the Hornes are not simply selling raisins in interstate commerce. They are selling raisins in a regulated market at a price artificially inflated by Government action in that market. That is the benefit the Hornes receive, and it does not matter that they "would rather not have" received it. *United States* v. *Sperry Corp.*, 493 U. S. 52, 62–63 (1989). Third, the Court points out that raisins "are not dangerous pesticides; they are a healthy snack." *Ante*, at 13. I could not agree more, but nothing in *Monsanto*, or in *Andrus* for that matter, turned on the dangerousness of the commodity at issue.

Government may condition the ability to offer goods in the market on the giving-up of certain property interests without effecting a *per se* taking.[3]  The Order is a similar regulation.  It has no effect whatsoever on raisins that the Hornes grow for their own use.  But insofar as the Hornes wish to sell some raisins in a market regulated by the Government and at a price supported by governmental intervention, the Order requires that they give up the right to sell a portion of those raisins at that price and instead accept disposal of them at a lower price.  Given that we have held that the Government may impose a price on the privilege of engaging in a particular business without effecting a taking—which is all that the Order does—it follows that the Order at the very least does not run afoul of our *per se* takings jurisprudence.  Under a different takings test, one might reach a different conclusion.  But the Hornes have advanced only this narrow *per se* takings claim, and that claim fails.

## III

The Court's contrary conclusion rests upon two fundamental errors.  The first is the Court's breezy assertion that a *per se* taking has occurred because the Hornes "lose the entire 'bundle' of property rights in the appropriated raisins . . . with the exception of" the retained interest in

---

[3] The Court points out that, in a footnote in *Loretto* v. *Teleprompter Manhattan CATV Corp.,* 458 U. S. 419 (1982), we suggested that it did not matter for takings purposes whether a property owner could avoid an intrusion on her property rights by using her property differently. See *ante*, at 12 (quoting 458 U. S., at 439, n. 17).  But in *Yee* v. *Escondido,* 503 U. S. 519 (1992), we clarified that, where a law does not on its face effect a *per se* taking, the voluntariness of a particular use of property or of entry into a particular market is quite relevant.  See *id.,* at 531–532.  In other words, only when a law requires the forfeiture of *all* rights in property does it effect a *per se* taking regardless of whether the law could be avoided by a different use of the property.  As discussed above, the Order is not such a law.

the equitable distribution of the proceeds from the disposi-
tion of the reserve raisins. *Ante*, at 8–9. But if there is a
property right that has not been lost, as the Court con-
cedes there is, then the Order has *not* destroyed each of
the Hornes' rights in the reserve raisins and does *not*
effect a *per se* taking. The Court protests that the re-
tained interest is not substantial or certain enough. But
while I see more value in that interest than the Court
does, the bottom line is that *Loretto* does not distinguish
among retained property interests that are substantial or
certain enough to count and others that are not.[4] Nor is it
at all clear how the Court's approach will be administra-
ble. How, after all, are courts, governments, or individu-
als supposed to know how much a property owner must be
left with before this Court will bless the retained interest
as sufficiently meaningful and certain?

One virtue of the *Loretto* test was, at least until today,
its clarity. Under *Loretto*, a total destruction of all prop-
erty rights constitutes a *per se* taking; anything less does
not. See 458 U. S., at 441 (noting the "very narrow" na-
ture of the *Loretto* framework). Among the most signifi-
cant doctrinal damage that the Court causes is the blur-
ring of this otherwise bright line and the expansion of this

---

[4] The Court relies on *Tahoe-Sierra Preservation Council, Inc.* v. *Tahoe
Regional Planning Agency*, 535 U. S. 302, 322 (2002), for the proposi-
tion that "'[w]hen the government physically takes possession of an
interest in property for some public purpose, it has a categorical duty to
compensate the former owner, regardless of whether the interest that is
taken constitutes an entire parcel or merely a part thereof.'" *Ante,* at
10. But all that means is that a *per se* taking may be said to have
occurred with respect to the portion of property that has been taken
even if other portions of the property have not been taken. This is of no
help to the Hornes, or to the Court, because it in no way diminishes a
plaintiff's burden to demonstrate a *per se* taking as to the portion of his
or her property that he or she claims has been taken—here, the reserve
raisins. As to that specific property, a *per se* taking occurs if and only if
the *Loretto* conditions are satisfied.

otherwise narrow category. By the Court's lights, perhaps a 95 percent destruction of property rights can be a *per se* taking. Perhaps 90? Perhaps 60, so long as the remaining 40 is viewed by a reviewing court as less than meaningful? And what makes a retained right meaningful enough? One wonders. Indeed, it is not at all clear what test the Court has actually applied. Such confusion would be bad enough in any context, but it is especially pernicious in the area of property rights. Property owners should be assured of where they stand, and the government needs to know how far it can permissibly go without tripping over a categorical rule.

The second overarching error in the Court's opinion arises from its reliance on what it views as the uniquely physical nature of the taking effected by the Order. This, it says, is why many of the cases having to do with so-called regulatory takings are inapposite. See *ante,* at 9– 12. It is not the case, however, that Government agents acting pursuant to the Order are storming raisin farms in the dark of night to load raisins onto trucks. But see Tr. of Oral Arg. 30 (remarks of ROBERTS, C. J.). The Order simply requires the Hornes to set aside a portion of their raisins—a requirement with which the Hornes refused to comply. See 7 CFR §989.66(b)(2); Tr. of Oral Arg. 31. And it does so to facilitate two classic regulatory goals. One is the regulatory purpose of limiting the quantity of raisins that can be sold on the market. The other is the regulatory purpose of arranging the orderly disposition of those raisins whose sale would otherwise exceed the cap.

The Hornes and the Court both concede that a cap on the quantity of raisins that the Hornes can sell would not be a *per se* taking. See *ante,* at 9; Brief for Petitioners 23, 52. The Court's focus on the physical nature of the intrusion also suggests that merely arranging for the sale of the reserve raisins would not be a *per se* taking. The rub for the Court must therefore be not that the Government is

doing these things, but that it is accomplishing them by the altogether understandable requirement that the reserve raisins be physically set aside. I know of no principle, however, providing that if the Government achieves a permissible regulatory end by asking regulated individuals or entities to physically move the property subject to the regulation, it has committed a *per se* taking rather than a potential regulatory taking. After all, in *Monsanto*, the data that the pesticide companies had to turn over to the Government was presumably turned over in some physical form, yet even the Court does not call *Monsanto* a physical takings case. It therefore cannot be that any regulation that involves the slightest physical movement of property is necessarily evaluated as a *per se* taking rather than as a regulatory taking.

The combined effect of these errors is to unsettle an important area of our jurisprudence. Unable to justify its holding under our precedents, the Court resorts to superimposing new limitations on those precedents, stretching the otherwise strict *Loretto* test into an unadministrable one, and deeming regulatory takings jurisprudence irrelevant in some undefined set of cases involving government regulation of property rights. And it does all of this in service of eliminating a type of reserve requirement that is applicable to just a few commodities in the entire country—and that, in any event, commodity producers could vote to terminate if they wished. See Letter from Solicitor General to Clerk of Court (Apr. 29, 2015); 7 U. S. C. §608c(16)(B); 7 CFR §989.91(c). This intervention hardly strikes me as worth the cost, but what makes the Court's twisting of the doctrine even more baffling is that it ultimately instructs the Government that it can permissibly achieve its market control goals by imposing a quota without offering raisin producers a way of reaping any return whatsoever on the raisins they cannot sell. I have trouble understanding why anyone would prefer that.

SOTOMAYOR, J., dissenting

\*    \*    \*

Because a straightforward application of our precedents reveals that the Hornes have not suffered a *per se* taking, I would affirm the judgment of the Ninth Circuit.   The Court reaches a contrary conclusion only by expanding our *per se* takings doctrine in a manner that is as unwarranted as it is vague.  I respectfully dissent.